## State of Connecticut *v.* Terrence Biggs
### (4851)

DUPONT, C. J., BIELUCH and NORCOTT, Js.

Argued September 29—decision released December 15, 1987

*William M. Bloss,* special public defender, for the appellant (defendant).

*Leah Hawley,* deputy assistant state's attorney, for the appellee (state).

NORCOTT, J. The defendant was charged by substitute information with attempted assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-59 (a) (1) and larceny in the second degree in violation of General Statutes §§ 53a-119 and 53a-123 (a) (1). After a trial by jury, the defendant was convicted on both counts. From those convictions the defendant now appeals.

The defendant claims that the trial court erred (1) in failing to suppress both the in-court and out-of-court identifications of the defendant made by the complainant, and (2) in instructing the jury on the inferences it might draw from circumstantial evidence. We find no error.

The following facts are relevant to this appeal. On January 10, 1984, at approximately 9:30 p.m., the complainant looked out the living room window of his home in Hamden and saw his mother-in-law's car being driven away. The complainant could not see who was driving the car. Suspecting that the car was being stolen, the complainant ran out to his car and gave chase. It was snowing at the time.

The complainant followed his mother-in-law's car down several of the neighborhood streets until her car became stuck in the snow after its driver attempted to make a u-turn. At this point, the complainant positioned his car so that it was bumper to bumper with his mother-in-law's car. When both cars came to rest, the right headlight of the complainant's car shone directly on the front door on the driver's side of the other car. The surrounding area was well lit with street lights. It was at this point that the complainant caught his first glimpse of the driver of the stolen car. He also noticed that there was a male passenger in the car, but he focused primarily on the driver of the car. The complainant watched intently as the driver of the stolen car tried in vain for approximately ten seconds to free the car from the snow. Finally, the driver and the passenger jumped out of the stolen car and ran away from the area. The complainant had no further opportunity to view the driver's face. When the individuals who had stolen the car began to flee, the complainant pursued on foot. The complainant chased the individuals for some distance until the man who had been the driver

of the vehicle turned and, with his left hand, fired a gun at the complainant. The shot hit the complainant in the shoulder. The complainant ceased chasing the two individuals and returned to his car.

Two security guards from nearby Southern Connecticut State University arrived on the scene a short while later. One of the security guards remained with the complainant while the other immediately began following footprints in the snow that he surmised were those of the two fleeing individuals. The security guard tracking the individuals was soon joined by police officers and together they were able to follow one set of footprints until the footprints stopped at the back door of a three floor apartment building in New Haven.[1] The defendant, his mother, and his sister lived in a second floor apartment at that address.

A short time after the security guard arrived at the apartment building, additional members of the New Haven police force arrived and set up a cordon around the house. The basement of the house was then searched and nothing was discovered. Before the police could get a warrant to search the rest of the house, however, the cordon was removed. When the officers returned to the house at 8:30 a.m. the next morning with a search warrant, they were unable to locate any evidence relating to the crime of the previous evening.

While these events were occurring, a detective from the New Haven police department was interviewing the complainant. The complainant described the driver of the stolen vehicle as a black male, over six feet tall, between nineteen and twenty-one years of age, with a light complexion, short hair, slim build, and no beard. He also stated that the driver wore a dark blue pea coat,

---

[1] The two sets of footprints diverged at some point between the scene of the crime and the apartment building. The police attempted to follow the other set of footprints but were unsuccessful.

dark pants, and no hat. The complainant, however, was unable to describe the male passenger in the stolen vehicle.

The complainant was then taken to the hospital for treatment of his injuries. After he was released from the hospital, the complainant was taken to the police station where he was asked to view numerous photographs. After viewing from 150 to 600 photographs, however, the complainant was unable to identify anyone resembling the men who had stolen his mother-in-law's car.

The following evening the complainant was again asked to view photographs at the police station. The photographic array the complainant was asked to view contained a picture of the defendant, as well as pictures of anywhere from 40 to 150 black males. The defendant's picture was deliberately placed in the array because the police considered him a suspect. The complainant identified the defendant's photograph saying, "This is the guy, the picture of the guy that I believe shot me, the taller of the two. I cannot be positive until I see him in person." The complainant further remarked that although the defendant, as depicted in the photograph, bore a remarkable resemblance to the man who had shot him, his assailant had much shorter hair. The photographic arrays shown to the complainant were not preserved nor were any notations made indicating what pictures had been included in the arrays.

A warrant was issued for the defendant's arrest, and on March 27, 1984, the defendant was taken into custody. Before trial, the defendant moved to suppress the photographic identification made by the complainant and any subsequent identifications to be made by the complainant, arguing that the photographic array shown to the complainant was unnecessarily suggestive. In support of his claim he raised the following

arguments: (1) the complainant had a limited opportunity to view the driver of the stolen vehicle; (2) there was conflicting testimony adduced at the suppression hearing as to how many photographs the complainant was shown; (3) the police officer who showed the complainant the photographs testified that the complainant had stopped short of making a positive identification; and (4) the only testimony adduced about the photographs was that they were all of black males. He further argued that the existence of these factors necessitated the preservation of the arrays in this case. The trial court denied the motion to suppress, and the case proceeded to trial.

At trial, the defendant advanced an alibi defense. Both his mother and his sister testified that he had come home at approximately 7:30 p.m. on the night of the incident and had not left the house for the remainder of the evening. They further testified that a man named James Evans was admitted to their home by the defendant on the evening in question. James Evans testified that it was he and another man who had stolen the car and that the other man had fired the shot. Before the defendant's trial, Evans had pleaded guilty under the *Alford* doctrine to larceny in the second degree for the theft of the car.[2]

In rebuttal to the defendant's alibi claim, the state introduced testimony by an officer who had taken a statement from James Evans before the trial had commenced. The officer testified that Evans had told him

[2] Ordinarily, a guilty plea involves a defendant's admission that he committed the crime charged. Under the doctrine of *North Carolina* v. *Alford,* 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970), however, an accused can plead guilty without admitting that he committed the acts with which he is charged if (1) a factual basis exists for the plea, (2) the plea is voluntarily, knowingly, and intelligently entered, and (3) the trial court has inquired into and sought to resolve the conflict between the waiver of trial and the claim of innocence.

that the defendant helped him steal the car on the night in question and that the defendant was also the person who had shot the complainant. No objection was made to this testimony.

I

The defendant's first claim is that the trial court erred in denying his motion to suppress the in-court and out-of-court identifications made of him by the complainant. We do not agree with his claim.

The due process clause of the fourteenth amendment to the United States constitution requires the exclusion of identification evidence—including, as here, an in-court identification and testimony concerning a pretrial photographic identification—when the identification procedure used " ' "was so impermissibly suggestive as to give rise to a very substantial likelihood of an irreparable misidentification." *Simmons* v. *United States,* 390 U.S. 377, 384, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968).' *State* v. *Anderson,* 178 Conn. 287, 291, 422 A.2d 323 (1979)." (Footnote omitted.) *State* v. *Doolittle,* 189 Conn. 183, 190, 455 A.2d 843 (1983). This is so because "[a] conviction which rests on a mistaken identification is a gross miscarriage of justice." *Stovall* v. *Denno,* 388 U.S. 293, 297, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967). "In order to establish that a pretrial identification procedure has violated a defendant's constitutional right to due process, the defendant must prove (1) that the identification procedure was unnecessarily suggestive, and (2) that the resulting identification was not reliable under the totality of the circumstances." *State* v. *Hunt,* 10 Conn. App. 404, 407, 523 A.2d 514 (1987); see also *State* v. *Amarillo,* 198 Conn. 285, 291, 503 A.2d 146 (1986); *State* v. *Sims,* 12 Conn. App. 239, 242, 530 A.2d 1069 (1987).

The defendant argues that the photographic identification procedures used in this case were unnecessar-

ily suggestive, but his primary claim is that the state's failure to preserve the array has precluded him from a meaningful opportunity to meet his burden of proof in challenging the array. He asserts that the conflicting testimony about the number of pictures shown to the complainant and the fact that the only criterion used in selecting the pictures to be viewed was the person's race raises serious enough questions about the identification procedure as to compel the preservation of the array.

We recently had the opportunity to review a claim such as this in *State* v. *Hunt,* supra. In *Hunt,* we held that "the failure to preserve a photographic array does not preclude a finding that the identification procedure was not suggestive." Id., 408. Our decision was based on a long line of Connecticut Supreme Court cases to the same effect. See, e.g., *State* v. *Doolittle,* supra, 190; *State* v. *Lally,* 167 Conn. 601, 607, 356 A.2d 897, cert. denied, 423 U.S. 829, 96 S. Ct. 48, 46 L. Ed. 2d 46 (1975). Furthermore, in *Hunt,* we held that the failure to preserve a photographic array does not shift the burden of proof to the state to prove that the array was not suggestive. The facts of this case do not suggest any reason to depart from our holding in *State* v. *Hunt,* supra.

We note, however, that police departments continue to ignore our Supreme Court's suggestion that they preserve photographic arrays or at least make a notation as to which pictures were included in the array. *State* v. *McKnight,* 191 Conn. 564, 570 n.5, 469 A.2d 397 (1983); *State* v. *Doolittle,* supra, 190; *State* v. *Lally,* supra. The rationale behind the Supreme Court's suggestion is obvious. If the array is not preserved, the defendant will have a difficult, if not impossible, task in proving the suggestiveness of the array. Generally, the only people who see the array are the police officers who compile it and the witnesses who view it, and

they "cannot be expected to recall in sufficient detail photographs whose major importance is that they are *not* photographs of the suspect." (Emphasis in original.) *United States* v. *Sanchez,* 603 F.2d 381, 385 (2d Cir. 1979). Accordingly, we urge the police to follow our Supreme Court's suggestion that they preserve photographic arrays. The failure to do so may, under other circumstances, result in the exclusion of identification testimony and, perhaps, the unnecessary setting aside of an otherwise valid conviction.

Addressing the defendant's contention that the identification procedures were unnecessarily suggestive, we find that the trial court had sufficient evidence to support its conclusion to the contrary. "There was no evidence from any [witness] that the array was a 'stacked deck' with the defendant being 'one giant among a group of Lilliputians.' *State* v. *Maturo,* 188 Conn. 591, 596, 452 A.2d 642 (1982). . . . There is no evidence that the police in any way suggested to the [witness] which person [he] should identify. Cf. *State* v. *Austin,* 195 Conn. 496, 499, 488 A.2d 1250 (1985)." *State* v. *Hunt,* supra, 408–409. The record indicates that the complainant viewed a large number of photographs, 190 at the least, and chose only one as a likeness of the man who had shot him. The simple fact that race was the only criterion used in selecting the photographs to be included in the array is not enough to compel a conclusion that the array was suggestive.

"Even if [the court] were to assume, arguendo, that the identification procedures in this case were impermissibly suggestive, the identifications were nevertheless reliable under the totality of the circumstances." *State* v. *Hunt,* supra, 409. The complainant had an opportunity to view the defendant for approximately ten seconds in a well lit area. He was two hood lengths away from the defendant with his car lights shining directly on the defendant. The description he gave the

police was consistent with the defendant's appearance, and he made a strong, if not positive, identification of the defendant from a photographic array of 40 to 150 black males the day after the incident. See *Neil* v. *Biggers,* 409 U.S. 188, 199–200, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972); *State* v. *McKnight,* supra, 572; *State* v. *Hunt,* supra, 409. We find that the trial court did not err in allowing the evidence of the photographic array and in-court identification in this case.

## II

The defendant's second claim of error is that the trial court erred in instructing the jury on circumstantial evidence. Specifically, the defendant challenges the trial court's instruction that the jurors could draw an inference from circumstantial evidence if they found that it was "more probable than not that the fact to be inferred [was] true." Under the facts of this case we find no error in the giving of these instructions.

At the outset, we note that the defendant failed to object or except to this instruction at trial. We shall review the defendant's claim, however, because it implicates his constitutional right not to be convicted except upon proof beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 361, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973); *State* v. *Diorio,* 12 Conn. App. 74, 84, 529 A.2d 1320 (1987).

Our courts have consistently held that "a jury instruction in a criminal case which informs a panel that it may infer a fact when it is more probable than not that such a fact exists is erroneous 'because, as applied to inferences for the finding of facts that are essential elements of the crime, it unconstitutionally dilutes the state's burden of proving guilt beyond a reasonable doubt.' *State* v. *McKenna,* [11 Conn. App. 122, 135, 525 A.2d 1374 (1987)]. Such error, however, has been held

to be reversible only if it is reasonably possible that the jury was misled by the trial court's instructions. Id." *State* v. *Trujillo,* 12 Conn. App. 320, 330, 531 A.2d 142 (1987).

In determining whether it is reasonably possible that a jury was misled by a particular instruction, "our courts have focused upon the primary disputed factual issue which was before the jury in the case, and the bearing that the erroneous instruction had on such issue." Id., 330. " 'Where the principal factual issue is intent, which is characteristically proven by circumstantial evidence; see *State* v. *Chace,* 199 Conn. 102, 105, 505 A.2d 712 (1986); the trial court's instructions regarding the use of circumstantial evidence as proof of this essential element are subject to close scrutiny. See *State* v. *Rodgers,* [198 Conn. 53, 58, 502 A.2d 360 (1985)]. Where . . . the principal factual issue is identity, which is not classically dependent upon circumstantial evidence for its proof, the trial court's instructions may be read as a whole to determine whether it is reasonably possible that the jury was misled by an erroneous explanation regarding the use of circumstantial evidence. See *State* v. *Reddick,* [197 Conn. 115, 133, 496 A.2d 466 (1985), cert. denied, 474 U.S. 1067, 106 S. Ct. 822, 88 L. Ed. 2d 795 (1986)].' " *State* v. *Perez,* 10 Conn. App. 279, 283–84, 523 A.2d 508 (1987), quoting *State* v. *Farrar,* 7 Conn. App. 149, 155–56, 508 A.2d 49, cert. denied, 200 Conn. 805, 512 A.2d 229 (1986).

The defendant admits that the primary factual issue in dispute in this case was identity, but he argues that it was proven mainly by circumstantial evidence and, therefore, the court should subject the jury instructions to strict scrutiny. We do not agree.

There were several pieces of circumstantial evidence introduced at trial which tended to prove that the

defendant was the driver of the stolen automobile and the man who shot the complainant. A security guard testified that, on the night of the incident, he and several other officers followed footprints leading from the stolen car until the footprints came to an end just outside the building in which the defendant lived. One of the officers further testified that the defendant's mother later informed him that the defendant knew that he was being sought by the police and had run away to hide. In addition, the complainant testified that the man who shot him held the gun in his left hand, and other testimony revealed that the defendant was left-handed.

By far the most persuasive evidence introduced at trial, however, was direct evidence. The complainant identified the defendant both in court and in a pretrial photographic display as the man who had stolen the car and then shot him. In addition, a police officer testified that James Evans, the admitted passenger of the stolen car, gave a statement in which he implicated the defendant as both the driver of the stolen vehicle and the man who shot the complainant. Given this evidence we find no merit in the defendant's claim that identity was proven mainly by circumstantial evidence.

Accordingly, we read the jury instructions as a whole to determine whether it is reasonably possible that the jury was misled as to the state's burden of proof. *State* v. *Rodgers,* supra; *State* v. *Whitaker,* 12 Conn. App. 604, 606, 533 A.2d 233 (1987). We find that it is not. The trial court informed the jury several times that the defendant was presumed to be innocent and that it was not to convict the defendant except upon proof beyond a reasonable doubt. Further, the trial court specifically instructed the jury that the state had the burden of proving beyond a reasonable doubt that the defendant was the perpetrator of the crimes with which he was charged. "We hold, therefore, that 'it was not reason-

ably possible that the isolated use of the phrase "more probable than not" confused or misled the jury with regard to the state's heavy burden of proof.' " *State v. Robinson,* 204 Conn. 207, 211, 527 A.2d 694 (1987).

There is no error.

In this opinion the other judges concurred.