STATE OF CONNECTICUT *v.* PATRICK WALSH
(AC 21577)

Lavery, C. J., and Dranginis and Dupont, Js.

---

Argued October 26, 2001—officially released January 29, 2002

*Norman A. Pattis*, for the appellant (defendant).

*Denise B. Smoker*, assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, *Ronald G. Weller*, assistant state's attorney, and *Joan K. Alexander*, former supervisory assistant state's attorney, for the appellee (state).

*Opinion*

DUPONT, J. The defendant, Patrick Walsh, appeals from the judgment of conviction, rendered after a jury trial, of one count of murder in violation of General

Statutes § 53a-54a.[1] The defendant claims that the trial court improperly (1) denied him his right to a fair trial by requiring him to submit to an offer of proof before he testified, (2) deprived him of his sixth amendment right to confront witnesses by misapplying the rule against evidence of third party culpability, (3) deprived him of his right to confront a witness concerning a prior bad act and (4) denied him his right to a fair trial by giving a supplemental reasonable doubt instruction to the jury. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the evening of May 24, 1995, the victim, Cheri Newman, and her friend, Nicole Bolduc, went to a bar called the Come Back Lounge in Bristol. The victim and Bolduc met the defendant and his brother, James Walsh. Around 1 a.m., the victim drove her own car with the defendant and Bolduc as passengers to the Catholic War Veterans' Club in New Britain. James Walsh drove the defendant's truck to the Catholic War Veterans' Club to meet them. Shortly after arriving at that club, Bolduc wanted to leave. Bolduc made the defendant promise that the victim would get home safely that evening and then left. Bolduc drove the victim's car and followed the defendant's truck to the highway to find the proper route to her home. The defendant and the victim returned to the Catholic War Veterans' Club and stayed until about 4:30 a.m. The defendant then drove the victim in his truck to the defendant's tattoo parlor, Skin Dance in New Britain. While at the tattoo parlor, the victim was stabbed eight times in the back of the head and neck, and was struck in the back of the head with a ball peen hammer. One of the wounds penetrated the victim's spinal column, causing instant paralysis and death.

---

[1] General Statutes § 53a-54a provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception . . . ."

Later in the morning of May 25, 1995, the defendant called James Walsh and told him to come to the tattoo parlor because there had been an emergency. The defendant sounded frantic and distressed, and called James Walsh several times before the latter agreed to go to the tattoo parlor. When James Walsh arrived at the tattoo parlor, he found the door locked and the curtains drawn closed. The defendant let James Walsh into the tattoo parlor and told him that he had stabbed the victim and killed her. The defendant told James Walsh that the stabbing began in the back room of the tattoo parlor when the victim tried to flee the shop. The defendant overtook the victim toward the front of the shop, hit her with a ball peen hammer and then stabbed her again. The defendant also told James Walsh that he had cut his right pinkie finger during the struggle with the victim when the handle of the knife he used broke off. James Walsh also noticed a bloody napkin on the defendant's pinkie finger that day. The defendant asked James Walsh to look for the knife handle and to clean up a large bloodstain in the waiting room of the tattoo parlor. The defendant told James Walsh that he put the victim's body in a wooden box and that the box was placed in a large plastic trash bag with duct tape.

While the defendant and James Walsh were cleaning the shop, the defendant's employees, Steven Carp and Christopher Rinaldini, came to the tattoo parlor and were turned away by the defendant, who told them to come back later. When they returned, each was asked to assist in cleaning the shop. While cleaning, Carp noticed droplets of blood in a quantity greater than the amount associated with the process of tattooing. The defendant, James Walsh and Carp placed the wooden box in the defendant's truck.

The defendant also called his live-in girlfriend, Kelly Dunn. The defendant was upset, and he asked Dunn to bring him a clean pair of jeans and the financial records

for the shop. When Dunn arrived at the tattoo parlor, the defendant was wearing no shirt, smelled of alcohol and had a bloody Band-Aid on his pinkie finger. The defendant seemed agitated and told Dunn to get inside the shop and assist in cleaning. When Dunn realized that there was a body in the truck, the defendant told Dunn not to open her mouth or give him a hard time. The defendant told Dunn that there also was room in the truck for her. Dunn assisted in the cleaning of the store. Dunn observed the defendant calling his clients to cancel his appointments for the day. The defendant told his clients that the shop was closed due to pipes bursting. The defendant changed into the jeans that Dunn had brought him, and he gave the soiled jeans that he had worn earlier to Dunn. Dunn noted that there were stains that appeared to be blood on the jeans. The defendant told Dunn to wash those jeans with a lot of bleach. Dunn left the tattoo parlor to pick up the defendant's children and did not see the defendant until the following day.

Later, on May 25, 1995, the defendant and James Walsh drove the defendant's truck containing the wooden box with the victim's body to New Hampshire to bury the body on the property of the defendant's friend, Garrett Gardner. On the way to Gardner's property, the defendant and James Walsh stopped at the home of James Patchel, another friend of the defendant, who lived in Massachusetts. The defendant told Patchel that he had killed some guy in his tattoo parlor and that the body was in his truck. Patchel noticed that the defendant had a fresh wound on his hand. The defendant and James Walsh left Patchel's house with two shovels and a saw.

The defendant and James Walsh proceeded to Gardner's property, which was vacant. The defendant and James Walsh dug a shallow grave near the border of Gardner's property and placed the wooden box in the

grave. They also threw in some of the victim's personal effects and covered the makeshift grave.

When the defendant returned home, the victim's friends and family inquired about the victim's whereabouts. The defendant told them that he had left the victim at the Catholic War Veterans' Club. The defendant told the victim's friends and family that they should look for her at various crack houses. When questioned by the police concerning the victim's whereabouts, the defendant told them that he saw the victim leave the Catholic War Veterans' Club with two women in a brown car.

When the defendant returned to the home that he shared with Dunn, he told her that he had been in New Hampshire burying the body. When the defendant told the story to Dunn, he described the victim as "he" and implied that it was a man that he had killed. The defendant told Dunn that he had gotten into an argument with the victim at the tattoo parlor and it had turned into a fight. The defendant said that he had seen a steak knife and had stuck it in the back of the head, but the person did not die right away. The fight then continued toward the front of the tattoo parlor. The defendant also told Dunn that when the struggle went toward the front of the tattoo parlor, he had twisted the knife and at that moment, the victim turned to jelly and fell to the floor. The defendant also said that the victim was a small person and that he was surprised that the victim had put up such a good fight.[2] He also said that when he twisted the knife, the handle broke off, the blade had stuck in the victim's head, and he had cut his pinkie finger. The defendant was concerned because it was such a deep cut, and it might lead to some permanent damage and affect his career as a tattoo artist. The

---

[2] There was testimony that the victim was five feet five inches in height and weighed approximately 100 pounds.

defendant threatened Dunn and told her that if she went to the police, then he would have her and her family killed.

On August 11, 1995, Dunn went to the authorities accompanied by Pamela Walsh, the defendant's estranged wife. Dunn went to the authorities on the advice of a counselor at a battered women's shelter. Several days later, the New Britain police department and the Connecticut state police, along with authorities from New Hampshire, obtained a search warrant and went to Gardner's property to exhume the victim's body and the wooden box. The police found the victim unclothed below the waist. During a search of the tattoo parlor, police found blood on a carpet, floor and a curtain near the area in which the tattooing took place. DNA analysis of the samples taken from the curtain revealed that the samples had the same genetic profile as the victim.

At trial, the defendant testified that he and the victim were sexually intimate. The defendant also testified that on the day the victim disappeared, he had cut his finger while working on his motorcycle with a friend, Jimmy Calvo. Calvo testified that the defendant had cut his hand while working on a motorcycle in the defendant's garage.

The defendant also testified as to his version of the events on the evening of May 24, 1995, and the morning of May 25, 1995. The defendant stated that he was socializing at the Catholic War Veterans' Club with the victim and others. The defendant was paged by a biker associate who asked where he could purchase some narcotics. The defendant arranged to meet his associate and others at his tattoo parlor. The defendant testified that he saw the victim in the parking lot of the Catholic War Veterans' Club before he left to meet his friends. The victim then arrived at the tattoo parlor, but the defen-

dant did not know how the victim got to his tattoo parlor. The victim was looking for narcotics and already was highly intoxicated. The defendant suggested that she go into the back room where his friends were located and she did so. The defendant then heard an angry male voice, and then someone said, "I'm going to kill you." The defendant then saw the victim face down on the floor and he knew that she was dead. The defendant identified the four men in the shop at the time of the murder as Big Pete, Knucklehead Dave, Wrench and Gary. The four men wanted to dump the victim's body in a dumpster. An argument broke out over where the body should be taken, and he punched one of the men in the face. The four men then told the defendant that the disposal of the body was his responsibility and they left.

The state's rebuttal case included testimony from several witnesses with experience in surveillance of motorcycle clubs. Each witness testified that various data banks failed to contain any reference to the names given by the defendant.

I

The defendant first claims that the trial court undermined his right to present an adequate defense by enforcing a motion in limine that prohibited him from mentioning the Hell's Angels motorcycle club by name and by requiring him to submit an evidentiary offer of proof before testifying. We disagree.

The following additional facts are relevant to this claim. On July 13, 1998, the defendant stood trial for the first time for the murder of the victim in violation of § 53a-54a. During the first trial, testimony was allowed that referred to the Hell's Angels motorcycle club. The defendant testified at the first trial that he did not kill the victim, but was present when she was murdered. On cross-examination, the defendant refused

to identify the alleged murderers, claiming that it would place him in danger. As a result, the trial court struck his entire testimony. On August 6, 1998, a mistrial was declared due to a hung jury.

On April 19, 1999, the state filed a new information charging the defendant with murder in violation of § 53a-54a. The state filed a motion in limine on April 19, 1999, requesting that any reference to or evidence that the crime was committed by another be ruled upon before being presented to the jury in the new trial. The motion in limine also requested that any reference to the Hell's Angels motorcycle club or any other motorcycle club be ruled upon before being presented to the jury. The state argued that during the defendant's first trial, the defendant, through his counsel, repeatedly made reference to the Hell's Angels on the basis of a representation that the connection of those references to issues in the case would be made during trial and that they were relevant to the case. The defendant did not offer, thereafter, any evidence indicating that the Hell's Angels were involved in the homicide. The state argued that any reference to third party culpability or to the Hell's Angels without first requiring the defendant to establish its relevancy would prejudice unfairly the state's case.

On April 20, 1999, the court ruled that no mention of the Hell's Angels or any other specific motorcycle clubs would be allowed during voir dire. On May 10, 1999, the motion in limine was granted with respect to trial testimony and to third party culpability. On June 3, 1999, after a lengthy colloquy between the court and the parties, the court clarified its ruling and ordered that the phrase "motorcycle club" or "motorcycle associates" could be used, but any reference to specific motorcycle clubs was prohibited. The court concluded that the potential prejudicial value outweighed any probative value or relevance at that point in the trial. The

court granted the motion in limine without prejudice and stated that it would modify that ruling if third party culpability was established by the evidence presented or if the defendant testified and named the people he alleged were responsible for the murder. The trial proceeded and each witness was prohibited from naming any specific motorcycle club.

On June 10, 1999, the court granted the state's motion for an offer of proof prior to the defendant's taking the witness stand. The defendant was required to testify to satisfy the evidentiary offer of proof with respect to a defense of third party culpability. The defendant took the witness stand outside the presence of the jury and answered questions concerning third party culpability. The questions were limited to the identification and descriptions of the individuals whom he alleged were responsible for the murder. He testified as to the nicknames or first names of the four individuals he alleged were responsible for the crime. He stated that he did not know to which motorcycle club the alleged perpetrators belonged or with which clubs they were associated. The court ruled that the defendant had established a basis for a third party culpability defense and that the defendant would be allowed to testify to that effect.

On June 15, 1999, the court ruled that a portion of the motion in limine would remain in effect. The court ruled that although the defendant could present evidence of third party culpability, no mention of a specific motorcycle club would be permitted.

A

The defendant claims that the court's ruling requiring an evidentiary offer of proof forced him to earn the right to testify and violated his right to due process of law under the fourteenth amendment to the United

States constitution.[3] The defendant claims that the state was allowed to take a deposition of the defendant about central defense themes. This claim was not preserved at trial, and the defendant seeks review under the *Golding* doctrine.[4] See *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

The first prong of *Golding* concerns whether the record is adequate to review the claim set forth by the defendant. Id., 239. The record is sufficient to review the defendant's claim because the offer of proof and the discussion concerning the scope of the inquiry in the offer of proof was made outside the presence of the jury, but on the record.

The second prong of *Golding* concerns whether the claim is one of constitutional magnitude that alleges the violation of a fundamental right. Id. The defendant argues that requiring him to make an offer of proof violated his right to due process of law as guaranteed by the fourteenth amendment.[5] This is a constitutional claim, and therefore, his claim is reviewable. We next consider the third facet of *Golding*.

The purpose of an offer of proof has been well established by our courts. "First, it informs the court of the

[3] The fourteenth amendment to the United States constitution provides in relevant part: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law . . . ."

[4] Under *Golding*, if the record adequately supports the claim that a defendant clearly has been deprived of a fundamental constitutional right, a defendant can prevail on an unpreserved claim if *all* four of the following criteria are met: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." *State* v. *Golding*, 213 Conn. 233, 239–40, 576 A.2d 823 (1989).

[5] See footnote 3.

legal theory under which the evidence is admissible. Second, it should inform the trial judge of the specific nature of the evidence so that the court can judge its admissibility. Third, it creates a record for appellate review." *State* v. *Jenkins*, 56 Conn. App. 450, 456, 743 A.2d 660, cert. denied, 252 Conn. 947, 747 A.2d 523 (2000).

Specifically, this case dealt with the second purpose, a determination of whether the evidence concerning third party culpability was admissible. "It is well established that a defendant has a right to introduce evidence that another person committed the offense with which the defendant is charged. . . . The defendant must, however, present evidence that directly connects the third party to the crime. . . . It is not enough . . . to show that another had the motive to commit the crime . . . nor is it enough to raise a bare suspicion that some other person may have committed the crime of which the defendant is accused." (Citation omitted; internal quotation marks omitted.) *State* v. *Baker*, 50 Conn. App. 268, 277, 718 A.2d 450, cert. denied, 247 Conn. 937, 722 A.2d 1216 (1998).

In *State* v. *Anderson*, 28 Conn. App. 833, 842, 614 A.2d 438, (1992), rev'd on other grounds, 227 Conn. 518, 631 A.2d 1149 (1993), the defendant was required to make an offer of proof with testimony outside the presence of the jury to establish a claim of self-defense. This court found that the offer of proof did not deprive the defendant of a fair trial. Id., 844–45. As in *Anderson*, the defendant in the present case was required to make a showing that the evidence he wanted to present could be admitted. The offer of proof involved the defense of third party culpability, which had to be established before that evidence could be submitted to the jury. The court ruled that the defendant had made such a showing and would be allowed to present such a claim as his defense.

At the first trial, the defendant had refused to name the individuals whom he allegedly had seen commit the murder. The defendant's entire testimony, therefore, had to be stricken and disregarded by the jury. To prevent that from occurring a second time, the defendant was required in his second trial to make an offer of proof. An alternative was presented to the defendant's counsel if the defendant elected not to testify in making the offer of proof whereby the defendant's counsel could supply the court with the necessary information. That alternative was rejected by the defendant because it potentially could have resulted in the defendant's counsel having been called as a witness against the defendant.

The defendant claims that his testimony outside the presence of the jury gave the state an unfair advantage by, in effect, allowing the state to conduct a deposition into central defense themes. The offer of proof, however, was limited to questions concerning the identity of the four men the defendant allegedly had seen commit the murder. The defendant was asked about names, descriptions and affiliations of individuals who he claimed had committed the murder.[6] The state was not given the opportunity to ask about any events concerning the murder or any information leading up to or following the morning of May 25, 1995. The descriptions and the identities of the four men relate to the culpability of third persons. The defendant was not disadvantaged because he was allowed to introduce such evidence to the jury. The defendant was required only

[6] In addition to asking about the four men whom the defendant attempted to describe, the state asked the defendant for the name of the individual who gave him a pager. The defendant had claimed that he was paged that evening by the men who allegedly killed the victim. The state hoped to locate the account information concerning the pager to assist in the identification of the four men and to verify the existence of a working pager. The questions were again limited to only the identities and descriptions of the man who gave the defendant the pager.

to ensure that the evidence met the requirements for admissibility as third party culpability evidence. An alleged constitutional violation did not clearly exist or clearly deprive the defendant of a fair trial. Under the facts of this case, the third prong of *Golding* was not satisfied. Accordingly, this claim must fail.

B

The defendant also claims that he was denied the right to testify as to his fear of retaliation by the Hell's Angels. The defendant claims that this is equivalent to denying him his right to present a defense and his version of the facts. We disagree.

The court enforced the motion in limine with respect to the defendant when he did not link the four men who allegedly killed the victim to the Hell's Angels motorcycle club. The defendant could not state the phrase "Hell's Angels," but he was allowed to state "motorcycle club" and the word "associates." The defendant was allowed to testify concerning his fear of retaliation and, in fact, did so testify. The defendant was allowed to present his version of the events and was not disadvantaged. This claim fails both the second and third prongs of *Golding* because a fundamental constitutional right was not denied under the facts of this case, and the defendant clearly was not deprived of a fair trial.

II

The defendant next claims that the trial court violated his right to confront witnesses as set forth in the sixth amendment to the United States constitution.[7] The

---

[7] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense."

defendant claims that the court confused the prohibition against presenting evidence with respect to third party culpability with the defendant's right to cross-examine witnesses. Specifically, the defendant claims that witnesses were not able to use the phrase "Hell's Angels" in their testimony pursuant to the motion in limine. The defendant argues that this testimony could have gone to motive and bias of the witnesses and should have been allowed. We do not agree.

"Relevancy is an evidentiary question, and [e]videntiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice. . . . In determining relevancy, [t]he court must determine whether the proffered evidence is corroborative or coincidental, whether it is probative or tends to obfuscate, and whether it clarifies or obscures. In arriving at its conclusion, the trial court is in the best position to view the evidence in the context of the entire case, and we will not intervene unless there is a clear abuse of the court's discretion." (Citation omitted; internal quotation marks omitted.) *State* v. *Baker*, supra, 50 Conn. App. 278; see also *State* v. *Rolon*, 257 Conn. 156, 173, 777 A.2d 604 (2001).

The defendant argues that cross-examination on motive, bias and prejudice is a matter of right. See *State* v. *Fullwood*, 199 Conn. 281, 286, 507 A.2d 85 (1986); *State* v. *Vitale*, 197 Conn. 396, 402, 497 A.2d 956 (1985); *In re Marcel L.*, 14 Conn. App. 548, 551, 542 A.2d 340 (1988). The scope of cross-examination in those areas, however, is not unlimited. "In determining whether a defendant's right of cross-examination has been unduly restricted, we consider the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial." (Internal

quotation marks omitted.) *State* v. *Francis*, 228 Conn. 118, 124, 635 A.2d 762 (1993). "A defendant is allowed to cross-examine the state's witnesses to the extent that his questions are relevant to the issues raised in the case, and are not more prejudicial than they are probative." *State* v. *Pinnock*, 220 Conn. 765, 785, 601 A.2d 521 (1992).

The witnesses were allowed to testify about motorcycle clubs and to use the term "associates" during their testimony. Again, the only testimony not permitted was the name of a specific motorcycle club. The court reserved its right to modify its ruling if the defendant offered evidence linking the alleged third parties to a specific motorcycle club. The defendant either chose not to make that connection or was unable to provide that evidence. The court also ruled that it would decide whether a witness could name a specific motorcycle club on a case-by-case basis. The court made that determination either before the witnesses were cross-examined or before each witness was to testify on subjects concerning motorcycle clubs and, most specifically, the Hell's Angels. Again, the witnesses were allowed to testify as to their feelings concerning the motorcycle clubs, including fear of retaliation and any relevant events concerning the defendant's associations with the clubs.

The witnesses, including the defendant, were also allowed to testify about the "1 percent oath" that was associated with some motorcycle club associates.[8] The court excluded the identity of the club from evidence only after determining that the prejudicial value out-

---

[8] The defendant and James Walsh testified that the 1 percent oath requires those who have taken it to place the interests of those who have taken the oath above all other concerns. They also testified that, as an example, they will not cooperate with authorities such as the police. It may also require those who have taken the oath to be dishonest with authorities to protect others who have taken the oath.

weighed its probative value and relevance. See *State* v. *Francis*, 246 Conn. 339, 349–52, 717 A.2d 696 (1998). The defendant was able to question witnesses concerning the general subject of motorcycle clubs without mentioning any specific clubs by name to prevent undue prejudice. We find no abuse of discretion by the trial court.

## III

The defendant next claims that the trial court improperly prohibited him from cross-examining a witness about an unrelated homicide and the witness' efforts to avoid prosecution for the incident. We disagree.

The following additional facts and procedural history are relevant to this claim. The defendant sought to impeach James Walsh on cross-examination by asking him: "Isn't it true that in a prior incident, you went so far as to severely injure yourself, putting yourself in the hospital, in a ruse to deflect your own responsibility in a homicide?" Apparently, the defendant had a basis to believe that eleven or twelve years prior to the trial, James Walsh had stabbed himself following an unrelated homicide to avoid suspicion by the authorities of his true involvement in the crime. James Walsh was never charged with a crime related to that alleged incident.

The state objected to the mention of another homicide. The defendant claimed that he had a good faith basis for asking the question and that it went to the credibility of James Walsh. The state argued that it was a collateral bad act and too remote to be brought up as impeachment material. The trial court ruled that if it allowed the question, the word homicide could not be used and it would have to be labeled as an unnamed felony. In addition, the court considered the word, "ruse" to be "a conclusory, inflammatory type word" and the question would have to be worded in a more

neutral manner if the question was to be permitted. The state objected to a more neutral version of the inquiry and argued that the incident was too remote in time and was collateral to the current case. The state also argued that the incident would be highly prejudicial because it also allegedly involved a stabbing. In addition, the state argued that the incident was not tantamount to a lie or to similar evidence used to impeach a witness.

The court asked for the defendant's good faith basis for asking the question. Counsel for the defendant would not offer any more than his assertion that he did have a good faith basis to ask the question. After a colloquy between the court and counsel, the court sustained the state's objection to the question. The court noted that the defendant needed to establish more than his bald assertion of a good faith basis. Second, the prior incident was collateral to the current case. Third, the prior incident was too remote in time. Finally, the prior bad act was not the sort of evidence typically used to impeach the credibility of a witness. The court ruled that the prejudicial consequences would outweigh any minimal probative value.

The defendant argues that the question should have been permitted. On appeal, the defendant addresses only the court's reason concerning the alleged incident's not being the sort of evidence that should be allowed for impeachment purposes. The defendant argues that the act of injuring oneself to avoid suspicion in a crime is tantamount to lying, dishonesty or falsifying evidence. The defendant ignores all of the other reasons cited by the trial court for refusing to allow the question to be asked of the witness. We find no impropriety in the decision of the trial court.

"Our standard of review of a claim that the court improperly limited the cross-examination of a witness

is one of abuse of discretion. . . .[I]n . . . matters pertaining to control over cross-examination, a considerable latitude of discretion is allowed. . . . The determination of whether a matter is relevant or collateral, and the scope and extent of cross-examination of a witness, generally rests within the sound discretion of the trial court. . . . Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion." (Citations omitted; internal quotation marks omitted.) *Dubreuil* v. *Witt*, 65 Conn. App. 35, 41–42, 781 A.2d 503 (2001). "To establish an abuse of discretion, the defendant must show that the court's restrictions clearly prejudiced him." (Internal quotation marks omitted.) *State* v. *Hall*, 66 Conn. App. 740, 755, 786 A.2d 466 (2001), cert. denied, 259 Conn. 906, 789 A.2d 996 (2002).

An inquiry into an act of misconduct that indicates a lack of veracity is permissible, but does not necessarily have to be permitted during cross-examination. *State* v. *Roma*, 199 Conn. 110, 117, 505 A.2d 717 (1986). We do not need to determine whether the incident as alleged by the defendant would indicate a lack of veracity because the trial court cited other reasons to refuse to permit the inquiry, none of which the defendant challenges. The alleged incident was quite remote in time and collateral to the case being tried. Facts about the alleged incident would have been highly prejudicial if admitted, and the value in impeaching the credibility of the witness would have certainly been minimal. The witness testified about his current incarceration,[9] his own drug use during the night in question and his beliefs with respect to the 1 percent oath.[10] In addition, the defendant has not shown

---

[9] The witness, James Walsh, testified that he was currently incarcerated as a result of charges stemming from his involvement with the disposal and cover-up of evidence involving the murder of the victim.

[10] See footnote 8.

that any additional attack on the witness' credibility would have affected the outcome of this trial. See *State* v. *Moody*, 214 Conn. 616, 629, 573 A.2d 716 (1990).

## IV

The defendant's final claim is that the court improperly gave a supplemental reasonable doubt instruction to the jury. We are not persuaded.

The following additional facts are relevant to this claim. Following the presentation of evidence and the closing remarks by counsel, the court delivered a charge to the jury that included an instruction on reasonable doubt. On Friday, June 18, 1999, the jury began deliberations. Later that day, the jury asked for the entire testimony from selected witnesses and portions of testimony from other witnesses to be read to it. The jury also requested that following the read back of each witness' testimony, the jury be allowed to go back to the deliberation room and deliberate. The court granted that request. On June 18, 1999, the jury also asked for copies of the charge on reasonable doubt and consciousness of guilt.

When court resumed on Monday, June 21, 1999, the remaining testimony from the selected witnesses was read. On June 22, 1999, outside the presence of the jury, the court informed the parties that it had recently received the December, 1998 volume of the Connecticut Selected Jury Instructions Manual. The court stated that after reviewing the cases in the section regarding the charge on reasonable doubt, one additional sentence should be added to the original charge. See R. Leuba & R. Fracasse, Connecticut Selected Jury Instructions Manual (1998) § 2.8, p. 31. The added sentence was that "[reasonable doubt] is not a doubt suggested by counsel which is not warranted by the evidence." Id.

The defendant objected and argued that because the sentence was not in the initial charge, its inclusion

would emphasize that issue and the jury would focus on it. The defendant also argued that the added sentence is similar to the portion of the "ingenuity of counsel" instruction of which our Supreme Court has expressed disapproval. See, e.g., *State* v. *Edwards*, 247 Conn. 318, 329–30, 721 A.2d 519 (1998); *State* v. *Taylor*, 239 Conn. 481, 504, 687 A.2d 489 (1996), cert. denied, 521 U.S. 1121, 117 S. Ct. 2515, 138 L. Ed. 2d 1017 (1997). The court ruled that the sentence would be included in the supplemental charge. The court read the reasonable doubt instruction with the sentence added[11] and pro-

---

[11] The court's supplemental charge to the jury with respect to reasonable doubt was as follows: "Now, ladies and gentlemen, as stated, the burden is on the state to prove each and every element of the crime charged beyond a reasonable doubt. It is not enough for the state to prove only certain of those elements, because if proof of even one element is lacking, you must find the accused not guilty of that crime. Again, the state's burden is proof of each and every element of the crime charged beyond a reasonable doubt.

"The meaning of reasonable doubt can be arrived at by emphasizing the word 'reasonable.' It is not a doubt based on surmise or guess or mere conjecture. It is not a doubt which is not justified by the evidence or lack of evidence. *It is not a doubt suggested by counsel which is not warranted by the evidence.* It is such a doubt as in the serious affairs that concern you, you would heed and pay attention to, that is, such a doubt as would cause reasonable men and women to hesitate to act upon it in matters of importance. It is not a hesitation springing from any feelings of pity or sympathy for the accused or any other persons who might be affected by your decision. It is, in other words, a real doubt, an honest doubt, a doubt which has its foundation in the evidence or lack of evidence. It is a doubt that is honestly entertained and is reasonable in light of the evidence after a fair comparison and careful examination of the entire evidence.

"Proof beyond a reasonable doubt does not mean proof beyond all doubt. The law does not require absolute certainty on the part of the jury before it returns a verdict of guilty. The law requires that after hearing all the evidence, if there is something in the evidence or lack of evidence that leaves in the minds of the jurors as reasonable men and women a reasonable doubt as to the guilt of the accused, then the accused must be given the benefit of that doubt and acquitted. Proof beyond a reasonable doubt is proof that precludes every reasonable hypothesis except guilt and is inconsistent with any other rational conclusion.

"A reasonable doubt is a doubt which is something more than a guess or a surmise. It is not a conjecture or a fanciful doubt. A reasonable doubt is not a doubt which is raised by someone simply for the sake of raising doubts nor is it a doubt which is not justified by the evidence or lack of evidence.

vided the jury with a copy of the requested portions of the charge. On June 22, 1999, the jury returned a verdict of guilty.[12]

This court has approved language identical to the sentence that was added to the supplemental charge; *State* v. *Owens*, 63 Conn. App. 245, 260–62, 775 A.2d 325, cert. denied, 256 Conn. 933, 776 A.2d 1151 (2001); *State* v. *Green*, 62 Conn. App. 217, 241–45, 774 A.2d 157, cert. granted on other grounds, 256 Conn. 927, 928, 776 A.2d 1147, 1148 (2001); and the defendant concedes that the language is approved language.[13] The defendant argues, however, that given the circumstances of the case, the addition of the sentence in the supplemental charge during a critical stage of the proceedings deprived him of his right to due process under the fourteenth amendment. The defendant argues that the sentence added to the supplemental charge confused the jury and lowered the burden of proof required for

A reasonable doubt is a doubt based on reason and not on the mere possibility of innocence.

"Now, absolute certainty in the affairs of life is almost never attainable, and the law does not require absolute certainty on the part of the jury before you return a verdict of guilty, that is, the state is not required to prove guilt beyond all doubt or to an absolute certainty. However, if you can in reason reconcile all of the facts proved with any reasonable theory consistent with the innocence of the accused, then you cannot find him guilty.

"On the other hand, if you find that the proven facts do establish the guilt of the accused beyond a reasonable doubt, then the defendant must be found guilty. The test is one of reasonable doubt premised on reason and common sense." (Emphasis added.)

[12] On October 6, 1999, the defendant was sentenced to fifty-five years imprisonment.

[13] In his brief, the defendant argues that the sentence used by the court in its supplemental charge was the "ingenuity of counsel" charge that our Supreme Court has warned against using in jury instructions. *State* v. *Taylor*, supra, 239 Conn. 504. The added sentence does not contain the phrase "ingenuity of counsel," which the *Taylor* court and subsequent cases have admonished trial courts not to use. At oral argument, the defendant conceded that the language used by the court was approved language, but that the circumstances in which the court used the approved language made it approach the "ingenuity of counsel" charge. We do not agree.

the state to obtain a conviction. His argument is that because he testified that the murder was committed by four men whom he could not identify by full names or accurate descriptions and his defense theory was third party culpability, the court's adding a sentence to its original charge was not harmless error. We do not agree.

In determining whether a trial court's charge satisfies constitutional requirements, however, "individual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury." (Citations omitted; internal quotation marks omitted.) *State* v. *Diaz*, 237 Conn. 518, 536–37, 679 A.2d 902 (1996); see also *State* v. *Schiappa*, 248 Conn. 132, 171, 728 A.2d 466, cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999). The main and supplemental charge must be examined as a whole to determine if the jury was misled. *State* v. *Miller*, 36 Conn. App. 506, 514, 651 A.2d 1318, cert. denied, 232 Conn. 912, 654 A.2d 357 (1995).

The sentence added to the charge was approved language; see *State* v. *Green*, supra, 62 Conn. App. 242; and the instructions taken as a whole did not mislead the jury. The sentence was given in the context of an entire charge on reasonable doubt and was not given to the jury in isolation. The original instruction included the sentence, "[a] reasonable doubt is not a doubt which

is raised by someone simply for the sake of raising doubts, nor is it a doubt which is not justified by the evidence or lack of evidence." The supplemental charge only added the term "counsel" to that phrase. The added sentence did not give the jury any new insights into the term "reasonable doubt" and did not cast doubt on the defense theme that other people had committed the crime.

The circumstances of this case are not significantly different from other cases in which the defense counsel raised the question of whether the state has proven all elements of the crime beyond a reasonable doubt. When taken as a whole, the jury instructions on reasonable doubt did not cause injustice to the defendant.

The judgment is affirmed.

In this opinion the other judges concurred.