## STATE OF CONNECTICUT *v.* ALBERT RIVERA
## (AC 19998)

Schaller, Bishop and Stoughton, Js.

Argued January 16—officially released June 4, 2002

*William B. Westcott*, special public defender, for the appellant (defendant).

*Leon F. Dalbec, Jr.*, senior assistant state's attorney, with whom, on the brief, were *Eugene Callahan* and *David I. Cohen*, state's attorneys, and *Maureen Ornousky*, senior assistant state's attorney, for the appellee (state).

*Opinion*

STOUGHTON, J. The defendant, Albert Rivera, appeals from the judgment of conviction, rendered after a jury trial, of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4).[1] On appeal, the defendant claims that (1) the Stamford police department's failure to preserve intact the photographic arrays from which he was identified violated his state and federal due process rights, (2) the trial court improperly refused to instruct the jury that it could consider the failure to preserve the photographic arrays in assessing the reliability of the identifications and (3) the trial court improperly refused to allow him to present evidence of a third party's culpability. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the evening of January 23, 1998, Daniel Berry and his father, James Berry, were working at Berry's Turn of River Convenience store in Stamford. Shortly after 9 p.m., the defendant entered the store. As he entered, he brushed against a departing customer, Rich-

---

[1] General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver . . . or other firearm, except that in any prosecution under this subdivision, it is an affirmative defense that such pistol, revolver . . . or other firearm was not a weapon from which a shot could be discharged. . . ."

ard Ferrara. Ferrara had been in the store for some time purchasing and scratching off instant lottery tickets. Earlier that evening, Ferrara had seen the defendant sitting with another man in a car in the store's parking lot. Also, two or three times during the evening, Ferrara and Daniel Berry had observed the defendant walk up to the store, look in and walk away.[2]

Upon entering the store, the defendant proceeded to the candy rack, selected a couple of candy bars and brought them to the register. As Daniel Berry rang up the sale, the defendant pulled out a plastic bag and a handgun and demanded all the money in the register. Daniel Berry complied, putting approximately $800 or $900 in the plastic bag. As this was happening, James Berry, who was crouched behind the counter putting cigarettes on the shelf, stood up. The defendant pointed the gun at his face and told him to shut up. He then said to Daniel Berry, "[N]ow I want your receipts." Daniel Berry again complied, putting some invoices in the bag with the money. The defendant then backed out of the store, pointing the gun at both Daniel and James Berry. After the defendant left, Daniel Berry called the police and described the robber to the officers when they arrived.[3]

[2] Daniel Berry testified that he observed a person fitting the defendant's description "casing the place." He stated that "[a]t least twice during the evening I saw him in the very front of the store . . . the very front outside of the store, the exterior. . . .

"[A]t least twice I saw him . . . . I can see outside from the window here from the register who is outside even though there's magazines in a couple of the windows, but I saw him at least walk up here, look inside and observe what was going on and walk away again."

Ferrara testified that he observed the defendant looking in the store widow on three separate occasions that evening.

[3] Sergeant Gerald Obuchowski of the Stamford police department wrote down Daniel Berry's description of the robber while at the scene of the robbery. At trial, Obuchowski testified that Daniel Berry described the robber as follows: "[A] Spanish—Hispanic male, heavy set in the vicinity of 200 pounds, approximately five feet eight, very stocky, he was wearing a hooded blue winter jacket, had a slight Spanish accent, and was armed with a long barrel gun."

Later that evening, Daniel Berry and James Berry went to the Stamford police station and gave separate statements describing the incident. They were also shown a book containing numerous photographs of persons who previously had been arrested for armed robbery in Stamford. The defendant's photograph was not in this book because, at that time, he never had been arrested for armed robbery. Neither Daniel Berry nor James Berry was able to identify the robber from any of the photographs in the book. Sometime thereafter, Sergeant Gerald Obuchowski and Officer Thomas McGinty put together an array of fourteen photographs based on Berry's description of the robber. On February 6, 1998, McGinty showed the fourteen photographs to Daniel Berry and James Berry. James Berry picked out the defendant's photograph from the array, but Daniel Berry was unable to identify any of the photographs. McGinty then shuffled the photographs and showed them again to James Berry, who again picked out the defendant's photograph.

On February 9, 1998, McGinty showed Ferrara seven of the fourteen photographs that were shown to the Berrys, along with a duplicate photograph of the defendant.[4] Ferrara selected the defendant's photograph from the array as the person he had observed outside the store on the evening of January 23, 1998. Thereafter, the defendant was arrested. At trial, both James Berry and Ferrara made an in-court identification of the defendant. The defendant subsequently was convicted of robbery in the first degree, and this appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that his state and federal due process rights were violated by the Stamford police

[4] Because, as required by Stamford police department procedure, McGinty had James Berry sign and date the back of the defendant's photograph that he picked out of the array, a duplicate photograph had to be used in the array shown to Ferrara.

department's failure to preserve intact the photographic arrays from which he was identified.[5] Specifically, the defendant argues that because the police failed to preserve intact the actual photographs used in the arrays from which he was identified and the order in which they were shown, it was impossible for him to sustain his burden of showing that the procedure that the police used was unnecessarily suggestive and that the identification was unreliable. We are not persuaded.

The following additional facts are relevant to our resolution of the defendant's claim. Prior to trial, the defendant moved to suppress "any identification testimony . . . on the grounds that the identification procedures employed by the Stamford police department were unnecessarily suggestive and the identifications [were] unreliable under the totality of the circumstances." During the hearing on the motion, the defendant argued that the Stamford police department's failure to preserve the photographic arrays deprived him of his due process rights.

In its memorandum of decision on the defendant's motion, the court found, inter alia, that the police showed James Berry fourteen photographs that corresponded to the general description of the perpetrator given by the Berrys. From this photographic array, James Berry selected the defendant's photograph, which he signed and dated. The defendant's photograph was then placed in the case file and the remaining photographs were returned to the mug shot files. Three days later, an array of eight photographs was shown to Ferrara from which he selected the defendant's photograph. The court concluded that there was nothing in the record to indicate that the identification proce-

[5] The defendant fails to provide an independent analysis under the state constitution. Thus, we confine our analysis to a discussion of the defendant's rights under the federal constitution. See *State* v. *Cepeda*, 51 Conn. App. 409, 413 n.8, 723 A.2d 331, cert. denied, 248 Conn. 912, 732 A.2d 180 (1999).

dure that the police utilized was unduly suggestive. It also remarked that the defendant failed to show that Ferrara's identification was unreliable under the totality of the circumstances. As to the preservation issue, the court, in rejecting the defendant's argument, stated the following: "The record will reflect your comments. I don't intend to make any further findings of fact or law for the record. I've made my decision . . . ."

In *State* v. *Biggs*, 13 Conn. App. 12, 18–19, 534 A.2d 1217 (1987), cert. denied, 207 Conn. 801, 540 A.2d 73 (1988), we stated that police departments should follow "our Supreme Court's suggestion that they preserve photographic arrays or at least make a notation as to which pictures were included in the arrays" and that "[t]he failure to do so may, under [certain] circumstances, result in the exclusion of identification testimony and, perhaps, the unnecessary setting aside of an otherwise valid conviction." "The rationale behind the Supreme Court's suggestion is obvious. If the array is not preserved, the defendant will have a difficult, if not impossible, task in proving the suggestiveness of the array." Id., 18.

At the evidentiary hearing on the defendant's motion to suppress, McGinty testified with respect to the Stamford police department's standard identification procedure. He stated that after a witness identified a photograph, he was asked to sign and date it on the back and the photograph was placed in the police case file. The police would then record the identification numbers of the other photographs in the array and the date each was taken and return them to the identification bureau file. He further testified that by utilizing this procedure, the police were able to reproduce the photographic array for trial, as they did in the present case.

Although the defendant cross-examined McGinty and other state's witnesses with respect to the identification

procedure, no evidence was presented that indicated that the photographs produced for trial were not the actual photographs used in the photographic arrays from which the defendant was identified, and if they were not, that they were in any way different from those photographs. Moreover, there is no evidence to suggest that the photographs were marked in any way, nor is there any reason for even the most cynical person to suppose that they might have been, since the police had no particular suspect in mind when they assembled the array to show James Berry. Also, the defendant has not indicated any reason why the order in which the photographs were displayed would make a difference in this case.

After a careful review of the record, we perceive nothing improper in the identification procedure used by the police. Although the police did not save the arrays intact, they did preserve the arrays by recording which photographs had been used in the arrays so that they could be reconstructed for trial. Indeed, by making a notation as to which photographs had been included in the arrays so that they could be reproduced if later needed, the police followed this court's suggestion in *State* v. *Biggs*, supra, 13 Conn. App. 18. Moreover, even if the arrays were not adequately preserved, in *State* v. *Hunt*, 10 Conn. App. 404, 408, 523 A.2d 514 (1987), we held that "the failure to preserve a photographic array does not preclude a finding that an identification procedure was not suggestive" nor does it shift the burden of proof to the state. The facts of this case do not suggest any reason to depart from our holding in *Hunt*.

In the absence of any evidence to suggest that the photographs included in the arrays used to identify the defendant were in any way different from those produced at trial, we conclude that the photographic arrays were adequately preserved by the procedure that

the police employed. Accordingly, the defendant's claim is without merit.

## II

The defendant next claims that the court improperly refused to instruct the jury that it could consider the failure to preserve the photographic arrays in assessing the reliability of the identifications. Because we already have concluded in part I of this opinion that the photographic arrays were adequately preserved, the defendant was not entitled to a jury instruction suggesting that the police failed to preserve the arrays. Accordingly, we conclude that the court properly refused to instruct the jury with respect to that issue.

## III

The defendant's final claim is that the court improperly refused to allow him to present evidence of a third party's culpability in violation of his right to present a defense under the sixth and fourteenth amendments to the United States constitution. We disagree.

The following additional facts are relevant to our resolution of the defendant's claim. Daniel Berry testified that, during the robbery, the defendant ordered him to put all the money in the register in a plastic bag and then demanded all the store's receipts. Later, McGinty testified that he knew of only one other robbery in which the robber asked for receipts in addition to money. He testified that this other robbery occurred in Stamford at the Ava Marie Variety store four days after the subject robbery.

After the state rested its case, the defendant proposed to call as a witness Louis Velez, the victim of a second robbery. In an offer of proof, the defendant informed the court that Velez was prepared to testify that four days after the subject robbery he was robbed by a five foot, four inch Hispanic man with a slight beard, who

wore a hooded jacket that partially obscured his face, displayed a nine millimeter weapon and demanded store receipts in addition to money. Velez also intended to testify that after the robbery, the police showed him a stack of photographs that included the defendant's photograph. He further would testify that the police tried to persuade him to identify the defendant, whom he knew, as the robber and that he told the police that the defendant was not the person who had robbed him. The state objected to the admission of the testimony. The court sustained the state's objection, ruling, inter alia, that the proffered evidence was collateral and therefore inadmissible.

"It is well established that a defendant has a right to introduce evidence that another person committed the offense with which the defendant is charged. . . . The defendant must, however, present evidence that directly connects the third party to the crime. . . . It is not enough . . . to show that another had the motive to commit the crime . . . nor is it enough to raise a bare suspicion that some other person may have committed the crime of which the defendant is accused." (Internal quotation marks omitted.) *State* v. *Walsh*, 67 Conn. App. 776, 787, 789 A.2d 1031, cert. denied, 260 Conn. 906, 795 A.2d 546 (2002).

"The admissibility of evidence of third party culpability is governed by the rules relating to relevancy. . . . No precise and universal test of relevancy is furnished by the law, and the question must be determined in each case according to the teachings of reason and judicial experience. . . . The trial court has wide discretion in its rulings on evidence and its rulings will be reversed only if the court has abused its discretion or an injustice appears to have been done." (Citations omitted; internal quotation marks omitted.) *State* v. *Boles*, 223 Conn. 535, 549, 613 A.2d 770 (1992).

In the present case, the defendant failed to offer any evidence directly linking a third party to the commission of the robbery at Berry's Turn of River Convenience store. "Unless that direct connection exists it is within the sound discretion of the trial court to refuse to admit such evidence when it simply affords a possible ground of possible suspicion against another person." (Internal quotation marks omitted.) *State* v. *Baker*, 50 Conn. App. 268, 279, 718 A.2d 450, cert. denied, 247 Conn. 937, 722 A.2d 1216 (1998). The fact that the victim of a similar robbery in Stamford stated that the defendant was not responsible for that robbery at most raises a bare suspicion that another person may have committed the subject robbery. See *State* v. *Prunier*, 28 Conn. App. 612, 621, 613 A.2d 311, cert. denied, 224 Conn. 903, 615 A.2d 1046 (1992). Accordingly, we conclude that the trial court did not abuse its discretion in excluding the proffered evidence.

The judgment is affirmed.

In this opinion the other judges concurred.