### STATE OF CONNECTICUT *v.* JOHN H. HUNT (4843)

BORDEN, SPALLONE and BIELUCH, Js.

Argued February 4—decision released April 7, 1987

*Steven F. Meo,* special public defender, with whom, on the brief, was *Margaret E. Flynn,* certified legal intern, for the appellant (defendant).

*Susan C. Marks,* deputy assistant state's attorney, with whom, on the brief, were *John M. Bailey,* state's attorney, and *James Thomas,* assistant state's attorney, for the appellee (state).

SPALLONE, J. The defendant is appealing from a judgment of conviction, after a jury trial, of the crime of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4). The defendant's sole claim of error is that the trial court erred in refusing to suppress the identification evidence. We find no error.

On July 6, 1984, a man, armed with a gun, entered a convenience store, pointed the gun at the eighteen year old cashier and demanded that she give him "all the money." He fled on foot with approximately $1000. The cashier was able only to state that the perpetrator was a black man with short hair, and she was unable to identify him at trial. Two other persons, however, were present at the robbery and both of them subsequently identified the defendant from two different photo arrays. Both witnesses also identified the defendant in court as the robber.

Prior to the trial, the defendant moved to suppress the photo identifications on the ground that the police procedures were impermissibly suggestive. By the same motion, he sought to suppress the in-court identifications as "irreparably tainted" by those procedures.

During the hearing on the defendant's motion to suppress, evidence was introduced from which the trial court reasonably could have found the following facts. Dale Carlow, a witness, entered the convenience store on the evening in question and proceeded to the back of the store. While there, he heard a man at the coun-

ter saying either "Give me the money" or "Give me all the money." Upon noting this, Carlow walked towards the cashier hoping to disarm the robber. When Carlow reached the counter, the person robbing the store turned and pointed the gun at him, giving Carlow a view of the perpetrator's face for about four to five seconds. Moments later, another witness entered the store causing the man with the gun to turn again, giving Carlow another full faced view that also lasted four to five seconds. In addition to these two frontal views, Carlow was also able to view from an arm's length distance one-half to three-quarters of the robber's face for a period of about one minute while they were both standing at the counter. Carlow described the robber as a person of average build, with curly hair and an oval face who was wearing a striped shirt.

Kurt Rideaux, the other witness who later identified the defendant as the robber, had pulled up to the front of the store and observed an individual standing at the counter and thought he was someone he knew. Upon entering the store, Rideaux realized he did not know the man. As he walked past the area of the cash register, he heard the man demanding money from the cashier. The robber turned slightly to the side allowing Rideaux to get a clearer view of him. Rideaux was six or seven feet from the individual and was able to get a full frontal view of him for fifteen to twenty seconds.

Five days after the robbery, on July 11, 1984, Carlow picked out a picture of the defendant from a photo array. He stated that he was "one hundred percent" certain that the photo he selected was that of the robber. Approximately ten days after the robbery, Rideaux also picked out the defendant's photo from an array. He stated at that time that the photo was "very close" to his memory of the perpetrator. At the trial, he testified that he was 90 percent certain that the photo he selected was that of the perpetrator. Both Carlow and

Rideaux made an in-court identification of the defendant and both stated that their identification in court arose out of the encounter at the robbery and not from any recollection of the photograph.

The photo arrays presented to the witnesses by the police were somehow misplaced and were unavailable at the suppression hearing. Nevertheless, on the basis of the testimony of the eyewitnesses and of the officer who presented the arrays to the witnesses, the trial court found that the identification procedures utilized in this case were not impermissibly suggestive. It therefore denied the defendant's motion to suppress.

In order to establish that a pretrial identification procedure has violated a defendant's constitutional right to due process, the defendant must prove (1) that the identification procedure was unnecessarily suggestive, and (2) that the resulting identification was not reliable under the totality of the circumstances. *State* v. *Boucino,* 199 Conn. 207, 218–19, 506 A.2d 125 (1986); *State* v. *Cubano,* 9 Conn. App. 548, 553, 520 A.2d 250 (1987). In arguing that the photo identification procedures were impermissibly suggestive, the defendant claims that the state's failure to preserve the array has precluded him from a meaningful opportunity to challenge the array. He asserts that the state's failure to preserve the arrays for his inspection and the apparent differences in the testimony between the witnesses and the police as to the make-up of the arrays compel the conclusion that the identification procedures were impermissibly suggestive.[1] The defendant relies on *United States* v. *Sanchez,* 603 F.2d 381 (2d Cir. 1979).

[1] The defendant alleges a violation of his due process rights under both the federal and state constitutions. Although the defendant correctly states that a state may interpret its own constitution to afford greater rights than those provided under the federal constitution; *State* v. *Kimbro,* 197 Conn. 219, 235, 496 A.2d 498 (1985); he has failed to advance any argument that the rights afforded him under the federal and state constitutions in this context are in any way distinguishable. In the absence of such an argu-

In *Sanchez,* the Second Circuit Court of Appeals found that where the government had failed to retain photo arrays used in a pretrial identification and where testimony regarding the composition of the array was "vague, contradictory, and of absolutely no assistance to a court in making the threshold inquiry of whether the pretrial identification procedure was impermissibly suggestive," the government "must bear the resulting unfavorable inference" from the failure to produce the array, and the court would assume that the pretrial identification procedure was impermissibly suggestive. Id., 385.

Connecticut law, however, clearly holds that the failure to preserve a photographic array does not preclude a finding that an identification procedure was not suggestive. *State* v. *Miles,* 195 Conn. 552, 555, 489 A.2d 373 (1985); *State* v. *McKnight,* 191 Conn. 564, 570–71 n.5, 469 A.2d 397 (1983); *State* v. *Doolittle,* 189 Conn. 183, 199, 455 A.2d 843 (1983); *State* v. *Lally,* 167 Conn. 601, 607, 356 A.2d 897, cert. denied, 423 U.S. 829, 96 S. Ct. 48, 46 L. Ed. 2d 46 (1975); *State* v. *Wiggins,* 7 Conn. App. 95, 100, 507 A.2d 518 (1986). Furthermore, in none of these cases did the court hold, as the defendant urges us to hold now, that the burden with regard to impermissible suggestiveness should shift from the defendant to the government when the government fails to preserve the original photo arrays. We find that in spite of the unavailability of the photographs, the trial court in this case had sufficient evidence to support its conclusion that the procedures were not impermissibly suggestive. There was no evidence from any of the witnesses that the array was a "stacked deck" with the defendant being "one giant among a group

ment, we will, under the circumstances of this case, deem the defendant's rights under the state and federal constitutions to be coextensive. See *State* v. *Alexander,* 197 Conn. 180, 183 n.1, 496 A.2d 486 (1985); *State* v. *Perez,* 10 Conn. App. 279, 281 n.3, 523 A.2d 508 (1987); *State* v. *Rogers,* 9 Conn. App. 208, 214 n.3, 518 A.2d 399 (1986).

of Lilliputians." *State* v. *Maturo,* 188 Conn. 591, 596, 452 A.2d 642 (1982). Both witnesses, without any prompting by the police, identified the defendant as the robber. There is no evidence that the police in any way suggested to the witnesses which person they should identify. Cf. *State* v. *Austin,* 195 Conn. 496, 499, 488 A.2d 1250 (1985). The witnesses reviewed the arrays separately and there is nothing in the record to suggest that they in any way communicated with each other between viewings. We cannot say that the trial court's decision that the array was not impermissibly suggestive was erroneous.

Even if we were to assume, arguendo, that the identification procedures in this case were impermissibly suggestive, the identifications were nevertheless reliable under the totality of the circumstances. See *State* v. *Davis,* 198 Conn. 680, 683–84, 504 A.2d 1372 (1986); *State* v. *Perez,* 198 Conn. 68, 75, 502 A.2d 368 (1985). Here, both identification witnesses had opportunities to view the defendant in bright light, manifested a high degree of attention, and were to a high degree certain of their identifications. Their identifications were consistent with their earlier descriptions and each made his identification within acceptable time limits from the occurrence. See *Neil* v. *Biggers,* 409 U.S. 188, 199-200, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972); *State* v. *McKnight,* supra, 572, *State* v. *Felder,* 7 Conn. App. 489, 495, 509 A.2d 542 (1986).

Our decision that the out-of-court identifications were not obtained as a result of impermissibly suggestive procedures and were reliable under the totality of the circumstances renders it unnecessary to consider whether the in-court identifications were irreparably tainted by the out-of-court procedures. The court did not err in denying the motion to suppress.

There is no error.

In this opinion the other judges concurred.