******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

STATE OF CONNECTICUT *v.* DALE
HOLLISTER KUKUCKA
(AC 39039)

Lavine, Sheldon and Elgo, Js.

*Syllabus*

Convicted of the crimes of strangulation in the first degree, sexual assault
in the third degree and assault in the third degree in connection with
an assault at a fife and drum corps gathering, the defendant appealed
to this court. He claimed, inter alia, that the trial court improperly failed
to inquire into a potential conflict of interest between him and his
defense counsel involving a grievance the defendant had filed against
defense counsel. *Held*:

1. The trial court did not fail in its duty to inquire into a potential conflict
   of interest between the defendant and his defense counsel: because the
   defendant, at trial, simply moved for new counsel and never made a
   claim that the grievance he filed against his defense counsel presented
   a conflict of interest, his claim of a conflict of interest was raised for
   the first time on appeal and, thus, there was no timely conflict objection
   at trial, the trial court gave the defendant two days to prepare a specific
   and extensive list of his complaints against his defense counsel, which
   it thoroughly addressed with the defendant at a hearing, and even though
   the court was not asked to address a conflict of interest, the defendant
   did not demonstrate how an inquiry into the nature of his grievance
   would have been materially different from the inquiry that the trial court
   conducted into the nature of his complaints against his defense counsel;
   moreover, given the context in which the grievance complaint was raised
   and the defendant's failure to assert a conflict of interest, the trial court
   had no reason to believe that a particular conflict of interest existed
   or that further inquiry was necessary, the record revealed nothing in
   subsequent hearings that triggered any duty to inquire further about the
   grievance complaint, and in light of the court's extensive exchange with
   the defendant, the assurances from defense counsel, and the defendant's
   expressed satisfaction with the resolution of his concerns culminating
   with his withdrawal of his motion for new counsel, the trial court had
   no additional duty to inquire about the substance of the grievance.

2. The trial court did not abuse its discretion in denying the defendant's
   motion to suppress in-court and out-of-court identifications of him that
   were made by a witness to the assault; even if the identification proce-
   dure of showing the witness a Facebook photo on a cell phone of the
   alleged assailant forty-five minutes after the assault was suggestive,
   given the public safety concerns and the immediate need to apprehend
   the assailant, the trial court properly found that the police procedure
   used was necessary due to exigent circumstances, and the court also
   concluded that the witness' identification of the defendant was reliable,
   as he had numerous opportunities to view the defendant during the
   daylong event, which included several exchanges with the defendant
   prior to the assault and attempts by the witness to restrain the defendant
   on the floor following the assault in a face-to-face physical altercation.

Argued October 19, 2017—officially released April 24, 2018

*Procedural History*

Substitute information charging the defendant with
the crimes of strangulation in the first degree, sexual
assault in the third degree, unlawful restraint in the
first degree, assault in the second degree, and assault
in the third degree brought to the Superior Court in the
judicial district of Middlesex, where the court, *Gold,
J.*, denied the defendant's motion to suppress certain
evidence; thereafter, the matter was tried to the jury;
verdict of guilty; subsequently, the court rendered judg-

ment in accordance with the verdict on the charges of strangulation in the first degree, sexual assault in the third degree, and assault in the third degree, from which the defendant appealed to this court. *Affirmed.*

*John L. Cordani, Jr.*, with whom was *Damian K. Gunningsmith*, for the appellant (defendant).

*Denise B. Smoker*, senior assistant state's attorney, with whom were *Russell Zentner*, senior assistant state's attorney, and, on the brief, *Peter A. McShane*, state's attorney, for the appellee (state).

*Opinion*

ELGO, J. The defendant, Dale Kukucka, appeals from the judgment of conviction, rendered after a jury trial, of strangulation in the first degree in violation of General Statutes § 53a-64aa (a) (1) (B), sexual assault in the third degree in violation of General Statutes § 53a-72a (a) (1), and assault in the third degree in violation of General Statutes § 53a-61 (a) (1).[1] On appeal, the defendant claims that the trial court improperly (1) failed to inquire into a potential conflict of interest between him and his defense counsel due to the existence of a grievance filed against defense counsel by the defendant and (2) denied his motion to suppress the in-court and out-of-court identifications of him made by a witness to the assault. We affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, are relevant to our resolution of the defendant's appeal. On October 19, 2013, the victim[2] attended a fife and drum corps muster at the Grange Hall in East Haddam with her friend, Jamie Murray (Jamie), and Jamie's family. The event, which was hosted by the Moodus Drum and Fife Corps, featured a parade of approximately twenty fife and drum corps and a beer tent in the afternoon and a bonfire in the evening. Many members of the participating fife and drum corps set up tents and brought recreational vehicles (RVs) to stay overnight on site. At the event, the victim and Erin Murray, Jamie's sister, were serving beer and cider in the beer tent. The defendant, a member of one of the participating fife and drum corps, visited the beer tent multiple times, both alone and with his date, Melody Baker. At approximately 5 p.m., when the defendant attempted to get another beverage from the beer tent after the beverage supply had been exhausted, Patrick Murray (Murray), Jamie's father and an event organizer, told the defendant that they were finished serving drinks. Later, however, the defendant entered the beer tent again. On that occasion, while Murray was cleaning up the beer tent, Murray's daughter, Erin Murray, called for him from the counter of the beer tent and Murray looked in her direction. When Murray looked up and saw the defendant, he firmly told him, once again, that they were out of drinks. Soon thereafter, when Murray saw the defendant approaching the beer tent a third time, he yelled at the defendant: "We're done. It's gone. Go."

Later in the evening, the victim and Jamie walked to the bonfire at the event. While sitting at the bonfire, the victim and Jamie talked with the defendant and Baker. At approximately 11:45 p.m., the victim went to the women's bathroom in the Grange Hall by herself. The victim was washing her hands when someone came up behind her and attacked her, grabbing her neck with his right hand and covering her mouth and part of her nose with his left hand. In the course of resisting her

attacker, the victim broke a window with her left elbow and banged on the wall of the bathroom. The victim was not able to remove her assailant's hands from her mouth or throat and ultimately lost consciousness. The victim was not able to identify her assailant following the incident.

At the same time, Erin McNamara, an event host, and Murray agreed that it was a good time to do a walkthrough of the Grange Hall and close it up for the evening. While McNamara and Murray were walking through the building, they heard grunting and thumping sounds along with sounds of "glass crunching or breaking" coming from the women's bathroom at the front of the building. McNamara proceeded to open the door to the bathroom, when she saw the victim lying motionless on the floor and the defendant straddling her. The victim's shirt had been pushed up to just under her breasts and the defendant's hands were under her shirt. McNamara locked eyes with the defendant and ordered him to leave the bathroom. The defendant then moved out of the bathroom. McNamara went directly to the victim, assessed her condition, and recognized that she was Jamie's friend. As the defendant walked out of the bathroom, Murray attempted to take him to the floor, but was unsuccessful. The defendant punched Murray in the face multiple times while they were fighting in the hallway outside the bathroom. During the altercation, the defendant attempted to enter the bathroom once again but McNamara ordered him out. Murray and the defendant resumed fighting after the defendant left the bathroom the second time. During the fight, the defendant hit the crash bar on the main door, pushed it open and ran away.

McNamara called 911 and was asked by the dispatcher to provide a description of the assailant. McNamara stated that she distinctly saw that he was Caucasian, approximately six feet tall and weighing approximately 220 pounds, who had dark hair and was wearing dark pants and a Kelly green fleece jacket. The police and an ambulance arrived at the scene shortly thereafter. Once the victim regained consciousness, she left the scene in the ambulance for medical treatment.

Murray gave a statement to the police about what had happened and provided a description of the assailant to Philip Soucy, a trooper with the state police. Approximately ten minutes after Soucy had taken Murray's statement, Baker approached Soucy after she had spoken with people in the area. Baker told Soucy that she knew a man named Dale who people were saying had sexually assaulted a woman. Using her cell phone, Baker showed Soucy a photograph of the defendant from the defendant's Facebook[3] page. With Baker's permission, Soucy took her cell phone and showed the Facebook photograph to Murray.[4] Soucy asked Murray if he recognized anybody in the photograph. Murray

responded that he recognized the individual, saying "that's the guy I took off [the victim]."

The defendant subsequently was arrested and charged with strangulation in the first degree, sexual assault in the third degree, unlawful restraint in the first degree, assault in the second degree and assault in the third degree. The defendant was tried to a jury, which found him guilty on all counts. The court rendered judgment on the jury's verdict; see footnote 1 of this opinion; sentencing him to a total effective sentence of fifteen years imprisonment, execution suspended after ten years. This appeal followed.

I

The defendant first claims that the trial court failed to inquire about a potential conflict of interest between him and his appointed legal counsel, James McKay. Specifically, the defendant argues that the court erred in failing to inquire into the nature of a grievance complaint that he had filed against McKay. We disagree.

The following additional facts are relevant to our resolution of the defendant's claim. Approximately six months prior to trial, although he was represented by McKay, the defendant filed a self-represented motion for a speedy trial. The motion was heard in court on April 7, 2015. At that time, the defendant claimed that he was disappointed with McKay's representation and asked that a special public defender be appointed for him by the court in lieu of McKay. The court inquired briefly as to the basis of the defendant's dissatisfaction and ultimately continued the case for two days "so that [the defendant] could have an opportunity to prepare a statement in which he would specifically identify the nature of his dissatisfaction, and point specifically to shortcomings, as he sees it anyway, in . . . McKay's representation."

On April 9, 2015, the defendant appeared before the court and provided the court with "concrete examples of why [he was] dissatisfied." First, the defendant expressed his belief that McKay and the prosecution had "teamed up" against him, as certain items of evidence had not been disclosed to counsel by the prosecution. Second, the defendant stated that McKay had "misinformed and manipulated" him into submitting to a "psychological evaluation that [McKay] knew, well and good . . . could be used by the prosecution as discovery and outright [lied] to me about the process of this motion he filed." Third, the defendant claimed that the delay in trial had resulted in actual and substantial prejudice against him. Lastly, the defendant listed fifteen "improprieties" by McKay, including his alleged failures to file motions, to seek pretrial discovery, to raise issues of insufficient evidence, to obtain evidence by discovery, to obtain critical documents, to obtain medical records, to properly advise him, to suppress

photographs, to pursue his speedy trial claim, to conduct basic legal research, to visit the crime scene, and to interview the victim. The court addressed each of the defendant's claims, explaining McKay's role in the case to the defendant in great detail. McKay also addressed the court at length, explaining that he was ready to continue representing the defendant zealously.

Describing the court's response as a "wonderful representation of conflict resolution," the defendant withdrew his motion for the appointment of new counsel. At the same time, the defendant stated to the court that he had filed a grievance against McKay.[5] In response to that statement, McKay stated that the grievance had not been brought to his attention before and that he would be required to respond to it. The court then asked the defendant if he presently intended to pursue the claims in the grievance. The defendant responded, "that's something I'm gonna have to go home and pray and think about, but the way it's looking right now, *probably not*." (Emphasis added.)

Three months later, the defendant sent the court a letter dated July 8, 2015, in which he wrote that the court had "never granted or denied [his] motion for replacement of counsel." In the letter, the defendant explained that when he reviewed the April 9, 2015 transcript, he realized that the record did not contain a ruling from the court on his motion for new counsel. The defendant stated: "I chose to suspend the speedy trial motion so I could pray, ponder, and think about if I felt comfortable continuing to have . . . McKay represent me . . . . I continue to have an open grievance filed against . . . McKay and have responded in writing to his [rebuttal]."

At the next hearing, on July 14, 2015, the court asked the defendant to clarify his intentions in light of the July 8, 2015 letter and given the court's understanding that his concerns already had been addressed. When the defendant asked the court to rule on his motion for new counsel, the court reminded the defendant that he had withdrawn that motion on April 9, 2015. As the court stated: "I do not believe there are any motions that I have failed to rule upon. So, I ask you, once again, given the fact that I have received this letter dated July [8, 2015], what is it that you are asking me to do?" The defendant stated that "[w]hen [he] suspended [his] motion for a speedy trial . . . [he] was under the impression [he] still needed to go home and to consider, pray and ponder over a difficult decision as to whether or not to retain . . . McKay as counsel." The court then explained to the defendant that "[y]ou are free to file any motions that you want to make. But, right now you keep saying to me you want me to rule on something that you have, previously, withdrawn." The defendant then asked the court to consider a "new motion for replacement of counsel." The court responded by ask-

ing, "what will be the reason for that? Are you hiring a new lawyer?" The defendant responded, "I am in the process of contemplating and thinking about that, yes, Your Honor." The court explained to the defendant that "unless you're going to present to me [a] compelling reason why there should be a new lawyer then . . . McKay is going to remain [your] lawyer. I am not going to accept, at this point, that you are praying and pondering over whether or not you should retain private counsel. So, if you're hiring private counsel I would, sincerely, and seriously, urge you to tell that lawyer with whom you're engaged in negotiations that the trial is scheduled to begin on September 21."

The defendant reiterated that he filed a grievance with the Statewide Grievance Committee but that he had not yet heard back from the committee. The court repeatedly communicated to the defendant that he was free to file another motion for new counsel and to explain why he was not satisfied with McKay. McKay addressed his relationship with the defendant, stating that he was "perfectly willing and able to proceed." Finally, the court advised the defendant: "If you want to come to me with a motion and tell me why you think you're entitled to new appointed counsel, the ball's in your court and you'll have to file it." The defendant thereafter did not file a motion for new counsel, and McKay continued to represent the defendant.

On appeal, the defendant argues that the court was obligated to inquire into a possible conflict of interest as a result of the grievance complaint that he filed against McKay. "The sixth amendment to the United States constitution as applied to the states through the fourteenth amendment . . . guarantee[s] . . . a criminal defendant the right to effective assistance of counsel. . . . Where a constitutional right to counsel exists, our [s]ixth [a]mendment cases hold that there is a correlative right to representation that is free from conflicts of interest. . . . This right requires that the assistance of counsel be untrammeled and unimpaired by a court order requiring that one lawyer shall simultaneously represent conflicting interests. . . . Moreover, one of the principal safeguards of this right is the rule announced by this court that [a trial] court must explore the possibility of conflict . . . when it knows or reasonably should know of a conflict . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Vega*, 259 Conn. 374, 386, 788 A.2d 1221, cert. denied, 537 U.S. 836, 123 S. Ct. 152, 154 L. Ed. 2d 56 (2002). "To safeguard a criminal defendant's right to the effective assistance of counsel, a trial court has an affirmative obligation to explore the possibility of conflict when such conflict is brought to the attention of the trial [court] in a timely manner." (Internal quotation marks omitted.) *State* v. *Drakeford*, 261 Conn. 420, 427, 802 A.2d 844 (2002).

Our Supreme Court previously has articulated "two circumstances under which a trial court has a duty to inquire with respect to a conflict of interest: (1) when there has been a timely conflict objection at trial . . . or (2) when the trial court knows or reasonably should know that a particular conflict exists . . . ." (Internal quotation marks omitted.) *State* v. *Vega*, supra, 259 Conn. 388. The defendant claims that the latter duty applies in this case, arguing that the filing of a grievance complaint triggered a duty to inquire because the court knew or reasonably should have known that a particular conflict existed. It is undisputed that the defendant never raised a conflict objection at trial.[6]

Our analysis is limited to the actions of the trial court, specifically whether the trial court satisfied its duty to inquire into a potential conflict of interest.[7] We review the defendant's claim as a question of law, as to which our review is plenary. See *State* v. *Parrott*, 262 Conn. 276, 286, 811 A.2d 705 (2003). In analyzing the defendant's claim, we look to the definition of an attorney's conflict of interest as articulated by our Supreme Court. An attorney conflict of interest is defined as "that which impedes his paramount duty of loyalty to his client. . . . Thus, an attorney may be considered to be laboring under an impaired duty of loyalty, and thereby be subject to conflicting interests, because of interests or factors personal to him that are inconsistent, diverse or otherwise discordant with [the interests] of his client . . . ." (Internal quotation marks omitted.) Id., 287–88.

The defendant relies on *Morgan* v. *Commissioner of Correction*, 87 Conn. App. 126, 866 A.2d 649 (2005), for his claim that the trial court failed in its duty to inquire into the possibility of a conflict of interest. In *Morgan*, this court considered whether the petitioner had been denied effective assistance of counsel when the habeas court denied his motion to disqualify his attorney without inquiring into the nature of three grievances the petitioner had filed. Id., 127–28. This court concluded that the habeas court's summary denial of the motion to disqualify was improper, in that the habeas court failed to inquire whether the grievances concerned a possible conflict of interest. Id., 142–43. As a result, this court remanded the case for further proceedings to determine the nature of the three grievances. Id., 143; see also *In re Ceana R.*, 177 Conn. App. 758, 771–72, 172 A.3d 870 (2017), cert. denied, 327 Conn. 991, A.3d    (2018).

In *Morgan*, the petitioner specifically asserted a conflict of interest before the habeas court and claimed that he disagreed with his habeas counsel's trial strategy.[8] *Morgan* v. *Commissioner of Correction*, supra, 87 Conn. App. 129. When advised that the petitioner had filed three grievances, the habeas court stated that dissatisfaction with trial counsel's strategy was not a conflict of interest. Id. As this court observed in *Morgan*,

at no point did the habeas court inquire into the nature of the grievances filed against habeas counsel. Id.

In *Vega*, which the defendant also cites in support of his claims, defense counsel raised before the trial court the claim that the existence of a grievance which the defendant filed against him gave rise to a per se violation of the right to the effective assistance of counsel. *State* v. *Vega*, supra, 259 Conn. 388, 389–90. Like the petitioner in *Morgan*, the defendant in *Vega* specifically argued before the trial court that the filing of the grievance gave rise to a conflict of interest. Id., 389–90. Holding that a grievance does not constitute a per se violation of the right to the effective assistance of counsel, the court in *Vega* also held that the trial court conducted an appropriate inquiry into the "*nature of the defendant's complaints* about [trial counsel's] representation" and properly found no conflict of interest. (Emphasis added.) Id., 390–91.

Here, the defendant contends that the trial court, upon learning of the defendant's grievance, "appears to have repeated the same error as the trial court in *Morgan*," because it failed to ask about the specific nature of the grievance. We disagree.

In contrast to the present case, in both *Morgan* and *Vega* the claims were squarely raised before the court that the grievances presented conflicts of interest. Here, the defendant made no such claim. Instead, the defendant moved for new counsel and never specifically asserted a concern that his trial counsel had a conflict of interest. The defendant thus claims a conflict of interest for the first time on appeal. This distinction is significant for several reasons.

We reiterate that our Supreme Court observed in *Vega* that "[t]here are two circumstances under which a trial court has a duty to inquire with respect to a conflict of interest: (1) when there has been a timely conflict objection at trial . . . or (2) when the trial court knows or reasonably should know that a particular conflict exists . . . ." (Internal quotation marks omitted.) *State* v. *Vega*, supra, 259 Conn. 388. Because it is undisputed that the defendant did not raise a timely conflict of interest objection before the trial court, our analysis of the court's duty to inquire is therefore based on whether the court knew or reasonably should have known that a particular conflict existed.

Whether the trial court knew or reasonably should have known that a particular conflict of interest existed requires this court to consider the context in which a duty to inquire is triggered. See *Cuyler* v. *Sullivan*, 446 U.S. 335, 347, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980) (considering circumstances of case to determine whether trial court had duty to inquire whether there was conflict of interest). Here, the court had before it an oral motion for new counsel, which itself triggered

the trial court's duty to determine the basis for the defendant's complaints.

"Where a defendant voices a seemingly substantial complaint about counsel, the court should inquire into the reasons for dissatisfaction." (Internal quotation marks omitted.) *State* v. *Robinson*, 227 Conn. 711, 725, 631 A.2d 288 (1993); see also *State* v. *Gonzalez*, 205 Conn. 673, 685, 535 A.2d 345 (1987). "The extent of an inquiry into a complaint concerning defense counsel lies within the discretion of the trial court. . . . Moreover, the defendant's right to be represented by counsel does not grant a defendant an unlimited opportunity to obtain alternate counsel on the eve of trial . . . and may not be used to achieve delay in the absence of exceptional circumstances. . . . The appellate scrutiny of the trial court's inquiry into complaints concerning adequacy of counsel must be tempered by the timing of such complaints." (Citations omitted; internal quotation marks omitted.) *State* v. *Robinson*, supra, 725.

The trial court, in continuing the hearing for two days, gave the defendant the opportunity to prepare a specific and extensive list of his complaints regarding McKay, which it thoroughly addressed with the defendant. Although the court was not specifically asked to address a conflict of interest, the trial court's approach went far beyond not only the inquiry conducted in *Morgan*, but also the inquiry conducted in *Vega*,[9] which our Supreme Court found to have been appropriate.[10] *State* v. *Vega*, supra, 259 Conn. 389. In conclusory fashion, the defendant argues that the inquiry conducted in the present case, made in response to the motion for new counsel, was inadequate under *Morgan* simply because it did not inquire into the substance of the grievance itself. We are not persuaded.

First, the defendant has not demonstrated how an inquiry into the nature of the defendant's grievance would have been materially different from the inquiry the court conducted into the nature of the defendant's complaints about McKay. At its core, the inquiry on a motion for new counsel is essentially the same inquiry required of the court when a defendant asserts that the filing of a grievance raises a conflict of interest, a claim which, we reiterate, was not before the trial court. Compare *State* v. *Robinson*, supra, 227 Conn. 725 ("[w]here a defendant voices a seemingly substantial complaint about counsel, the court should inquire into the reasons for dissatisfaction" [internal quotation marks omitted]), with *State* v. *Vega*, supra, 259 Conn. 390–91 (in order to assess alleged conflict of interest, the trial court was required to inquire about "the nature of the defendant's complaints about his representation").[11]

Here, the court not only reviewed each of the defendant's concerns, but the defendant then withdrew his request for the appointment of new counsel and his motion for a speedy trial and described the hearing

as "a wonderful representation of conflict resolution." Apparently as an afterthought, the defendant then advised the court that he had filed a grievance against his defense counsel, at which point the court asked the defendant if he "[*intended*] *to continue to pursue* [*his*] *claims*" in the grievance. (Emphasis added.) Significantly, the defendant responded: "Again, that's something I'm gonna have to go home and pray and think about, *but the way it's looking right now, probably not.*" (Emphasis added.) The colloquy reflects not only the trial court's logical assumption that it had just reviewed the sum and substance of the defendant's grievance with defense counsel, but also the defendant's comments as implicitly reinforcing that assumption.[12] Given the context in which the grievance complaint was raised and the defendant's failure, unlike in *Morgan* and *Vega*, to assert a conflict of interest, the trial court had no reason to believe that a particular conflict of interest existed or that further inquiry into such a conflict was necessary. As a result of the court's extensive exchange with the defendant, the assurances from McKay, and the defendant's expressed satisfaction with the resolution of his concerns culminating with his withdrawal of his motion for new counsel, we conclude that the court had no additional duty to inquire about the substance of the grievance.

Moreover, the record reveals nothing in subsequent hearings that triggered any duty to inquire further about the grievance complaint. The U.S. Supreme Court has noted that the duty of inquiry is not triggered "when the trial court is aware of a vague, unspecified possibility of conflict . . . ." *Mickens* v. *Taylor*, 535 U.S. 162, 169, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002). "Unless the trial court knows or reasonably should know that a particular conflict exists, the court need not initiate an inquiry." *Cuyler* v. *Sullivan*, supra, 446 U.S. 347. The defendant offered no indication that the grievance complaint expressed concerns about counsel beyond the ones he had articulated in the first hearing. Instead, three months after the hearing in April, the defendant was under the mistaken belief that his motion to withdraw was still pending for the court to rule upon. Reminding the defendant that he had withdrawn his motion for new counsel, the trial court duly asked the defendant for clarification. The defendant then requested that the court appoint new counsel and suggested that he was "contemplating and thinking about" hiring new counsel, to which the court responded by urging him to file a motion for new counsel and to advise new counsel that trial would begin on September 21, 2015. The court at that time made it clear to the defendant that if he was seeking to remove his attorney he was free to file any motion he wished in order to explain why he was entitled to new counsel. In so doing, the trial court gave the defendant yet another opportunity to formally present to the court, by written motion,

any further concerns that he might have about his counsel's representation, an opportunity which the defendant declined to pursue. See *State* v. *Robinson*, supra, 227 Conn. 727 ("[e]ven though the trial court did not continually inquire into the defendant's complaints, it also did not close the line of communication with the defendant and allowed him to make frequent pro se motions to which it gave adequate consideration").

As our Supreme Court observed in *Robinson*, "a trial court has a responsibility to inquire into and to evaluate carefully all substantial complaints concerning court-appointed counsel, [but its] failure to inquire [into the defendant's request for new counsel where the defendant has already made known the reasons for his request] is not reversible error." (Internal quotation marks omitted.) Id., 726. As this court also observed in *State* v. *Patavino*, 51 Conn. App. 604, 609, 724 A.2d 514, cert. denied, 249 Conn. 919, 733 A.2d 236 (1999), it is well established that "a criminal defendant has a constitutional right to the effective assistance of counsel . . . that right, however, is not without limitation. . . . [I]t is clear that the right to effective assistance of counsel does not include an unlimited opportunity to obtain alternate counsel. . . . Inherent in these limitations is a concern for unwarranted interruptions in the administration of justice." (Citations omitted; internal quotation marks omitted.) Our review of the record also indicates that the court carefully advised the defendant of its concerns about the defendant's failure to articulate any reason for his request for new counsel and the timing of his renewed request.[13] "While courts must be assiduous in their defense of an accused's right to counsel, that right may not be manipulated so as to obstruct the orderly procedure in the courts or to interfere with the fair administration of justice." (Internal quotation marks omitted.) Id.

Most importantly for purposes of analyzing the court's duty to inquire into a conflict of interest, the defendant's trial counsel assured the court from the outset in April, and repeated again in July, that he could zealously represent his client. In discharging its duty to inquire, "the trial court must be able, and be freely permitted, to rely upon [defense] counsel's representation that the possibility of such a conflict does or does not exist. . . . The reliance in such an instance is upon the solemn representation of a fact made by [the] attorney as an officer of the court. . . . The course thereafter followed by the court in its inquiry depends upon the circumstances of the particular case." (Citations omitted; internal quotations marks omitted.) *State* v. *Drakeford*, supra, 261 Conn. 427. Notwithstanding his receipt of the grievance complaint, counsel represented to the court that he felt he had a good working relationship with the defendant and that the issues that had been raised by the defendant had been addressed. The court was free to rely upon defense counsel's represen-

tations, and in fact shared with the defendant its observations that counsel had "not only ably, but zealously [represented the defendant] for an extensive period of time, [had] retained an expert on [his] behalf, [had] read all the reports and [was] now ready to begin trial."

The duty of inquiry into a conflict of interest implicates a defendant's sixth and fourteenth amendment right to the effective assistance of counsel. See *State v. Crespo*, 246 Conn. 665, 685–86, 718 A.2d 925 (1998), cert. denied, 525 U.S. 1125, 119 S. Ct. 911, 142 L. Ed. 2d 909 (1999). As we have already stated, in the absence of an assertion of a conflict of interest at trial, our review on appeal is limited to determining whether the trial court knew or had reason to believe *a particular conflict* existed. *State v. Parrott*, supra, 262 Conn. 286. Here, in response to the defendant's initial motion for new counsel, the trial court's duty was to determine, in the first instance, what was the nature and substance of the defendant's complaints.

Since the filing of a grievance does not give rise to a per se conflict of interest under *Vega*, and the defendant, having led the court to believe it had resolved, to the defendant's satisfaction, his litany of specific complaints, the court had no reason to know a particular conflict of interest existed requiring it to conduct further inquiry about the grievance itself. Given that the trial court was faced in subsequent proceedings with only vaguely expressed complaints which the defendant declined to specify to the court by filing a written motion, and that it had received several assurances from defense counsel as to his ability to continue representing the defendant zealously, we conclude that the trial court did not fail in its duty to inquire into the specific nature of the grievance.

## II

The defendant next claims that the court improperly denied his motion to suppress the out-of-court and in-court identifications of him that were made by Murray. The defendant argues that Murray's identifications were the unreliable results of an unnecessarily suggestive procedure conducted in the absence of exigent circumstances supporting the need for an immediate identification. The defendant argues that the admission of Murray's identification testimony at trial violated his federal and state constitutional rights to due process. We disagree.[14]

The following additional facts are relevant to our resolution of this claim. On September 17, 2015, the defendant filed a motion to suppress identifications made by Murray and McNamara.[15] The trial court held a hearing on the motion to suppress, during which it heard testimony from several people, including McNamara, Murray, Jamie, Baker, Soucy, and the victim. The testimony revealed the following facts.

McNamara entered the women's bathroom and observed an assailant in the bathroom, straddling the victim. Her shirt was pushed up to just under her breasts and the assailant's hands were under her shirt. The lights were turned on in the bathroom and in the hallway outside of the bathroom. McNamara ordered the assailant out of the bathroom and Murray attempted to gain control of the assailant and hold him on the ground. After Murray was unable to gain control of the assailant, they were involved in a physical altercation. At some point during the physical altercation, the assailant attempted to reenter the bathroom and McNamara yelled very loudly "get the hell out of here" and pointed to the door. The assailant left the area and McNamara called 911.

Murray described the assailant as a white male with dark hair, 200 pounds, at least six feet tall, and wearing a loose fitting outer garment. McNamara described the assailant as a white male, who was around six feet tall, weighed 220 pounds, had dark hair, and was wearing a very vivid green fleece jacket. Murray had seen the assailant approximately eight times earlier that day, including during the parade, in the beer tent, and at the bonfire.

Murray described the incident to police while at the scene of the assault. Soucy asked Murray if he knew the name of the assailant and Murray replied that he did not know his name, but he knew the person. Murray was presented with a single photograph of the defendant. The photograph was an image that was on a cell phone that the police had obtained from Baker.[16] The police took the cell phone from Baker and, approximately forty-five minutes from the time of the assault, the police showed the picture to Murray. The officer asked Murray if he recognized the person, and Murray identified the image as depicting the person who had committed the assault.

The court denied the defendant's motion to suppress Murray's identifications of him. The court found that the exigencies of this case weighed in favor of the state, and thus concluded that the out-of-court identification procedure had not been unnecessarily suggestive. Furthermore, the court found that Murray's identification was reliable. Subsequently, at trial, both Murray and McNamara positively identified the defendant as the man they had seen in the bathroom straddling the victim on October 19, 2013.

The legal principles guiding our review of a court's denial of a motion to suppress a pretrial identification are well settled. "Upon review of a trial court's denial of a motion to suppress, [t]he court's conclusions will not be disturbed unless they are legally and logically inconsistent with the facts. . . . [W]e will reverse the trial court's ruling [on evidence] only where there is

abuse of discretion or where an injustice has occurred . . . and we will indulge in every reasonable presumption in favor of the trial court's ruling. . . . Because the issue of the reliability of an identification involves the constitutional rights of an accused . . . we are obliged to examine the record scrupulously to determine whether the facts found are adequately supported by the evidence and whether the court's ultimate inference of reliability was reasonable." (Internal quotation marks omitted.) *State* v. *Elliston*, 86 Conn. App. 479, 482–83, 861 A.2d 563 (2004), cert. denied, 273 Conn. 906, 868 A.2d 746 (2005).

"In determining whether identification procedures violate a defendant's due process rights, the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on examination of the totality of the circumstances. . . . The first suggestiveness prong involves the circumstances of the identification procedure itself . . . and the critical question is whether the procedure was conducted in such a manner as to emphasize or highlight the individual whom the police believe is the suspect. . . . If the trial court determines that there was no unduly suggestive identification procedure, that is the end of the analysis, and the identification evidence is admissible." (Citations omitted; internal quotation marks omitted.) *State* v. *Dickson*, 322 Conn. 410, 420–21, 141 A.3d 810 (2016), cert. denied,      U.S.    , 137 S. Ct. 2263, 198 L. Ed. 2d 713 (2017). "An identification procedure is unnecessarily suggestive only if it gives rise to a very substantial likelihood of irreparable misidentification. . . . The defendant bears the burden of proving both that the identification procedures were unnecessarily suggestive and that the resulting identification was unreliable." (Internal quotation marks omitted.) *State* v. *Thompson*, 81 Conn. App. 264, 269–70, 839 A.2d 622, cert. denied, 268 Conn. 915, 847 A.2d 312 (2004).

"The use of a single photograph for identification purposes is not overly suggestive per se. . . . It is, however, absent exigent circumstances, almost always unnecessarily and impermissibly suggestive. . . . The danger of misidentification of a suspect by a witness is increased where the photograph of an individual is in some way emphasized. . . . Showing a witness a single photograph rather than an array of photographs obviously emphasizes that photograph. . . . Any one-to-one type [of] confrontation between a witness or victim and a person whom the police present to him as a suspect must necessarily convey the message that the police have reason to believe that person guilty." (Citations omitted; internal quotation marks omitted.) *State* v. *Elliston*, supra, 86 Conn. App. 483–84. Our

Supreme Court also has "recognized, however, that the existence of exigencies may preclude such a procedure from being *unnecessarily* suggestive. . . . In the past, when we have been faced with the question of whether an exigency existed, we have considered such factors as whether the defendant was in custody, the availability of the victim, the practicality of alternate procedures and the need of police to determine quickly if they are on the wrong trail." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Ledbetter*, 275 Conn. 534, 549, 881 A.2d 290 (2005), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006).

In the present case, the single photograph used to identify the assailant was a Facebook photo on a cell phone. In evaluating whether the use of the photograph occurred under exigent circumstances, the court considered the following evidence. First, Murray viewed the photograph forty-five minutes after the assault that he had witnessed, which gave Murray the opportunity to identify the assailant while his memory was still fresh. Second, the identification procedure arose after an assailant had committed a violent sexual assault in a public place where hundreds of people were spending the night in tents and RV's and the assailant was still at large. Third, according to one witness, the name "Dale" was being circulated in the crowd as someone who had committed a sexual assault, and police needed to determine whether their efforts to locate "Dale" were likely to result in the capture of the right person. Finding that these factors amounted to exigent circumstances, the court concluded that the use of the cell phone photograph was not unnecessarily suggestive.

On the basis of our independent review of the record, we conclude that the trial court did not abuse its discretion in denying the defendant's motion to suppress. Even if we were to assume that the identification procedure was suggestive, we conclude that given the public safety concerns and the immediate need to apprehend the assailant, the court properly found that the procedure was necessary due to exigent circumstances. See *State* v. *Revels*, 313 Conn. 762, 769, 99 A.3d 1130 (2014), cert. denied,    U.S.    , 135 S. Ct. 1451, 191 L. Ed. 2d 404 (2015).

Moreover, the court also concluded that Murray's identification of the defendant was reliable. "If the court finds that there was an unduly suggestive procedure, the court goes on to address the second reliability prong, under which the corruptive effect of the suggestive procedure is weighed against certain factors, such as the opportunity of the [eyewitness] to view the criminal at the time of the crime, the [eyewitness'] degree of attention, the accuracy of [the eyewitness'] prior description of the criminal, the level of certainty demonstrated at the [identification] and the time between the

crime and the [identification]." (Internal quotation marks omitted.) *State* v. *Dickson*, supra, 322 Conn. 421; see also *Manson* v. *Brathwaite*, 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977).

Murray had numerous opportunities to view the defendant during the daylong event, which included several exchanges with the defendant prior to the assault. On several occasions, the defendant attempted to get another beverage from the beer tent, and Murray had to tell the defendant to leave the beer tent. Murray also paid particular attention to the defendant in the beer tent because he was uncomfortable with the way that he was staring at the victim and his daughter. There was lighting in both the bathroom and the Grange Hall where Murray confronted the defendant. While in the Grange Hall, Murray attempted to restrain the defendant on the floor, which ultimately resulted in a face-to-face physical altercation between them. He provided the police with a description of the assailant's race, gender, hair color, height, weight, and clothing. Approximately forty-five minutes after the assault, Murray viewed the Facebook photo presented to him by the police on Baker's cell phone, and he was certain that the man in the photo was the man who had assaulted the victim. Accordingly, the court did not abuse its discretion in denying the defendant's motion to suppress Murray's out-of-court identifications.[17]

The judgment of the court is affirmed.

In this opinion the other judges concurred.

[1] Although the jury also found the defendant guilty of unlawful restraint in the first degree in violation of General Statutes § 53a-95 (a) and assault in the second degree in violation of General Statutes § 53a-60a (a) (1), the trial court did not enter judgment on those charges because they arose from the "same incident" as the strangulation charge. See General Statutes § 53a-64aa (b).

[2] In accordance with our policy of protecting the privacy interests of the victims of sexual assault, we decline to identify the victim or others through whom her identity may be ascertained. General Statutes § 54-86e.

[3] "Facebook is a social networking website that allows private individuals to upload photographs and enter personal information and commentary on a password protected 'profile.' " *State* v. *Eleck*, 130 Conn. App. 632, 634 n.1, 23 A.3d 818 (2011), aff'd, 314 Conn. 123, 100 A.3d 817 (2014).

[4] It is undisputed that the police did not preserve the Facebook photo that Soucy presented to Murray.

[5] The grievance that the defendant filed with the Statewide Grievance Committee was not included in the record.

[6] While we acknowledge that a trial court is obligated to inquire into a conflict when it knows or reasonably should know that a particular conflict exists, given the facts of this case, by failing to submit the very concerns he now pursues on appeal, the defendant essentially asks us to engage in trial by ambuscade. See *State* v. *Campanaro*, 146 Conn. App. 722, 731, 78 A.3d 267 (2013) ("[f]or this court to . . . consider [a] claim on the basis of a specific legal ground not raised during trial would amount to trial by ambuscade, unfair both to the [court] and to the opposing party" [internal quotation marks omitted]), cert. denied, 311 Conn. 902, 83 A.3d 604 (2014). We decline to endorse such behavior.

[7] We note that in claiming trial court error, the defendant makes no claim that there was an actual conflict of interest or that his trial counsel was ineffective.

[8] The petitioner in *Morgan* argued that a conflict of interest existed between him and habeas counsel because he disagreed with the strategy that habeas counsel employed at the habeas proceeding. *Morgan* v. *Commis-*

*sioner of Correction*, supra, 87 Conn. App. 129. Responding to the petitioner's concern with his counsel's strategy, the court stated: "That is not a conflict of interest." (Internal quotation marks omitted.) Id. The court asked the petitioner, "[h]ow is there a conflict of interest between you and [counsel]?" (Internal quotation marks omitted.) Id. The petitioner replied, "I have filed several grievances [against] him with the statewide [grievance committee], at least five." (Internal quotation marks omitted.) Id. His habeas counsel then corrected him and informed the court that the petitioner had filed three grievances against him. Id. The court did not inquire further into the nature of the grievances that the petitioner filed against counsel. Id.

[9] In *Vega*, the following colloquy between the defendant and the court took place:

"The Court:  . . . I do want to ask you, Mr. Vega, some questions about this matter. Because apparently you do not have a copy of the document you sent to the grievance committee.

"The Defendant: No, I don't.

"The Court: You do not?

"The Defendant: No, sir. . . .

"The Court: All right. Have you in fact filed a grievance against [defense counsel]?

"The Defendant: Yes, I have.

"The Court: And when was that done?

"The Defendant: It was approximately Tuesday last week.

"The Court: Of last week?

"The Defendant: Yes.

"The Court: All right. The record should further reflect that [defense counsel] did call the grievance committee in East Hartford and they indicated that they either don't have it logged in or don't have it there yet, but it's possible that it's somewhere in the paperwork. Do you have anything, a copy of anything that would indicate what your claims are against [defense counsel]?

"The Defendant: No, Your Honor, except just my memory.

"The Court: All right. Would you indicate for me as best your memory allows you what is it you have grieved [defense counsel] for? . . .

"The Defendant:  . . . Just that counsel and I have not discussed this case thoroughly. There's aspects in this case that I feel like I could shed light upon. He disregards  . . . .  Really counsel's actions are not to my satisfaction. He ignores my request to interview associates who can describe me as who I am. . . .

"The Court: But is there anything further? . . . So your basic claim with the grievance committee are pretty much the same things you told me here Wednesday of this week as to why you wanted me to dismiss [defense counsel].

"The Defendant: Exactly." *State* v. *Vega*, supra, 259 Conn. 390–91 n.18.

[10] In making this comparison, we do not suggest that the trial court's decision here to continue the hearing for two days to allow the defendant to prepare a list of his concerns should be the standard in all cases. We are mindful of the constraints on our review, articulated in *State* v. *Robinson*, supra, 227 Conn. 725, to the extent that such inquiries must be "tempered by the timing of such complaints." We note that the defendant's oral motion was raised in the context of his motion for a speedy trial, and no trial date appears to have been scheduled. By contrast, our case law suggests that motions for new counsel are often raised on the eve of trial and even mid-trial.

[11] In *Robinson*, our Supreme Court considered the propriety of the trial court's inquiry into the defendant's complaints concerning his counsel's performance. *State* v. *Robinson*, supra, 227 Conn 725. The Supreme Court stated that "the record reveals that the trial court permitted the defendant an opportunity fully to inform the court of his grievances, treated them as important and took appropriate action where necessary or possible." Id., 726.

[12] In stating that he "would actually welcome the opportunity to sit down and break some bread with  . . .  McKay, and continue to go forward," the defendant declared his intention to "talk with  . . .  McKay so [they] could both collaborate and figure out what's gonna be best for [them] moving forward."

[13] "The Court: Well, with all due respect Mr. Kukucka, the court has to be careful that it does not cede its duty to a defendant insofar as court scheduling is concerned. This case has been scheduled for trial once at your demand that there be a speedy trial. When I brought the matter in and told

the lawyers to be ready you then pulled back and withdrew your motion for a speedy trial. You then withdrew it at the same time your request for new counsel. And now another three months [have] passed by, uneventfully, and now the lawyers report that they're ready to begin. Now, you're renewing your motion for new counsel.

"I'm not going to turn over to you the right to dictate the timing of this trial. And I'm beginning to have some concerns, in my mind, regarding whether or not that's exactly what you're trying to do, wrest control of this schedule from me and turn it over to yourself.

"This is an old case, the victim of the case, alleged victim of the case, has the right to have a speedy disposition, as do you. When you urged the court, or demanded a speedy trial, I was prepared to give it to you. The parties dropped everything, began to get it ready, then you withdrew that. You said you wanted a new lawyer, I was ready to hear you, then you said, no, I've changed my mind, I'm going to work with . . . McKay. This is not a game of ping-pong where you suddenly change your mind on each court date.

"So, unless you're going to present to me [a] compelling reason why there should be a new lawyer then . . . McKay is going to remain [your] lawyer. I am not going to accept, at this point, that you are praying and pondering over whether or not you should retain private counsel.

"So, if you're hiring private counsel I would, sincerely, and seriously, urge you to tell that lawyer with whom you're engaged in negotiations that the trial is scheduled to begin on September 21."

[14] We need not address the defendant's argument that any subsequent in-court identification was irreparably tainted by the unnecessarily suggestive out-of-court identification because we conclude that the out-of-court identification was the result of a necessary procedure. *State* v. *Dickson*, 322 Conn. 410, 433, 141 A.3d 810 (2016) (in-court identifications do not implicate defendant's due process rights when there has been a nonsuggestive out-of-court identification procedure), cert. denied,     U.S.     , 137 S. Ct. 2263, 198 L. Ed. 2d 713 (2017).

[15] On appeal, the defendant does not contest the trial court's admission of McNamara's in-court and out-of-court identifications of the defendant.

[16] The police failed to preserve the Facebook photo that the police officer showed to Murray. We note that "the failure to preserve a photographic array does not preclude a finding that an identification procedure was not suggestive." *State* v. *Hunt*, 10 Conn. App. 404, 408, 523 A.2d 514 (1987); see also *State* v. *Rivera*, 70 Conn. App. 203, 209, 797 A.2d 586, cert. denied, 261 Conn. 910, 806 A.2d 50 (2002).

[17] We further conclude from a review of the entire factual record that the admission of the Murray identification evidence, even if improper, was harmless beyond a reasonable doubt. "If the admission of eyewitness identification testimony is deemed to be improper, it is then subject to harmless error review." *State* v. *Aviles*, 154 Conn. App. 470, 478, 106 A.3d 309 (2014), cert. denied, 316 Conn. 903, 111 A.3d 471 (2015). "[B]ecause of the constitutional magnitude of the error, the burden falls on the state to prove that the admission of the tainted identification was harmless beyond a reasonable doubt." *State* v. *Artis*, 314 Conn. 131, 154, 101 A.3d 915 (2014). Even without Murray's pretrial and trial identifications, the state had a strong case against the defendant. McNamara also witnessed the assailant in the bathroom. McNamara identified the defendant out-of-court, in a double blind photo array administered by the police two days after the assault, and McNamara identified the defendant as the assailant at trial. The defendant also matched the description given by both McNamara and Murray. Furthermore, the defendant had a fair opportunity to cross-examine Murray at trial and challenge his identification of the defendant as the assailant. See id., 161 (defendant's opportunity to cross-examine eyewitness was factor in harmlessness analysis). Accordingly, we conclude that, even if the admission of the eyewitness identification testimony were improper, it was harmless beyond a reasonable doubt. See *State* v. *Aviles*, supra, 482.